In re J. B. & J. M. CORNELL CO.

(District Court, S. D. New York. November 15, 1912.)

1. RECEIVERS (§ 128*)—RIGHT OF MORTGAGE BONDHOLDERS.

The lien of mortgage bondholders of an industrial corporation cannot be displaced by a court without their explicit consent.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 205, 210, 219–222; Dec. Dig. § 128.*]

2. RECEIVERS (§ 127*)—RECEIVERS' CERTIFICATES—RIGHTS OF HOLDER.

The rights of a purchaser of receivers' certificates issued under proper authority are determined and limited by the court's order authorizing their issuance aided in interpretation somewhat by the petition on which it is based and such other documentary evidence as may be relevant.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 216–218; Dec. Dig. § 127.*

Receivers' certificates, see notes to Postal Telegraph Cable Co. v. Vane, 26 C. C. A. 350; Nowell v. International Trust Co., 94 C. C. A. 601.]

3. RECEIVERS (§ 128*)—RECEIVERS' CERTIFICATES—RIGHTS OF HOLDERS.

Receivers for a bankrupt industrial corporation having a valuable good will were authorized to continue the business for a specified time and to purchase necessary materials on credit; also to borrow $50,000 for stated purposes, and to apply later for authority to issue receivers' certificates. Their authority to continue the business was extended from time to time with the same powers. They petitioned for authority to issue receivers' certificates to the amount of $250,000, but reduced the amount asked for to $100,000, and the petition was granted with the consent of the mortgage bondholders, and with permission to apply for leave to issue additional certificates to the amount of $150,000. The order provided that the certificates authorized, known as series A, should be a lien on all the property prior to that of the mortgage. They afterward applied for and obtained authority to issue $100,000 additional in certificates, known as series B. To this order the bondholders did not consent, nor did it provide that the certificates should be a lien. *Held*, that they were not entitled to rank with series A to the displacement of the mortgage, but ranked the same as debts for materials purchased by the receivers on credit, either before or after their issuance.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 205, 210, 219–222; Dec. Dig. § 128.*]

4. RECEIVERS (§ 155*)—INDEBTEDNESS CONTRACTED BY RECEIVERS—RIGHT OF PRIORITY.

Where receivers are authorized to continue the business of an insolvent or bankrupt corporation for a definite time and to purchase materials on credit, persons extending credit, without security, for materials or otherwise, are charged with notice of a practice of the court to extend such

authority from time to time, and are not entitled to priority over later creditors of the same class.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 283–292; Dec. Dig. § 155.*]

In the matter of the J. B. & J. M. Cornell Company, bankrupt. On exceptions to report of special master determining priority of claims. Modified and confirmed.

See, also, 186 Fed. 859.

Murray, Prentice & Howland, Charles P. Howland, Lemuel Skidmore, and Luke Vincent Lockwood, all of New York City, for the motion.

Russell Lord Tarbox, Van Wyck & Mygatt, Albert T. Scharps, Kiddle, Wendell & Margeson, Floyd K. Diefendorf, and Edwin C. Ward, all of New York City, opposed.

MAYER, District Judge. By order of this court, dated June 9, 1911, it was provided:

"(1) That both of the bids of the New York Trust Company and Sarah K. Cornell, and of the bondholders of the bankrupt, both dated April 24, 1911, are accepted according to their respective terms and the conditions contained therein, and the receivers, the trustee, and the bankrupt are hereby directed to convey, transfer, and deliver forthwith to the bidders or their assignee the property, real and personal, described in their respective bids, free and clear from all liens and incumbrances of any character by whomsoever asserted, except as in said bids and hereinafter provided.

"(2) That, in full consideration for the purchase by the New York Trust Company and Sarah K. Cornell, the receivers accept the following: (a) The surrender for ultimate cancellation of the outstanding receivers' certificates, aggregating the principal sum of $175,000, with all accrued and unpaid interest thereon. (b) The undertaking of such bidders, as expressed in their bid, to pay in cash up to the sum of $16,000 the unpaid fees of the receivers, trustee, and their counsel; and also the fees of the referee and appraisers as and when the same shall be fixed by this court. (c) The undertaking of such bidders contained in their joint and several bond filed in this court and hereinbefore referred to.

"(3) The receivers are hereby directed, pursuant to the proviso contained in the bid of the New York Trust Company and Sarah K. Cornell, to use their best efforts diligently to collect and to realize upon all assets now in or hereafter coming into their hands not directed to be sold by this order and to pay over the proceeds of the same up to the amount of cash paid by such bidders under subdivision 'b' of the foregoing clause of this order to such bidders or their assignee.

"(4) That, in consideration for the purchase by the bondholders, the receivers accept the surrender for ultimate cancellation of the entire amount of outstanding bonds of the bankrupt, secured by mortgage to the United States Mortgage & Trust Company, aggregating $630,000, with all unpaid coupons attached and the offer of said bondholders that such creditors as shall under the terms of their bid of April 24, 1911, establish a right to share in the proceeds of sale if the same were paid in cash, shall have respective liens in such amounts and with such respective priorities as they would have been entitled to if the purchase price had been paid in cash, subject as to the amount of such respective claims to the deduction of the amounts of cash respectively received by such creditors from any other source.

"(5) That all claims against the receivers, present or inchoate, of creditors entitled to participation in the purchase price payable under either bid be filed, in writing and duly verified, with William Allen, Esq., referee in this

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

proceeding. * * * That said referee take proof of the validity, effect, and relative priority in respect of any of the items or assets of each claim so filed, and report the same, with his decision thereon, to this court with convenient speed, with the right in all claimants, including all the bidders, to contest the validity, effect, or relative priority of the claim of any other creditor until final adjudication as defined in said bids. That the receivers' certificates of indebtedness and the bonds of the bankrupt secured by its mortgage to the United States Mortgage & Trust Company, although surrendered to the receivers hereunder, shall be regarded as outstanding for the purpose in the case of the receivers' certificates of enabling the New York Trust Company and Sarah K. Cornell to prove before the referee the claims represented thereby, and in the case of the bonds of enabling the holders of said bonds to prove before the referee the lien of the mortgage securing said bonds and the claims of such bidders to the purchase price payable under their bid if the same had been in cash, and in the case of both sets of bidders for the purpose of enabling them to contest the validity, effect, and relative priority of the claim of any creditor of the receivers; and such certificates of indebtedness and such bonds shall be canceled only upon the final adjudication of such of said claims of creditors as may be filed with the referee as in this order provided, or at the expiration of the time for filing such claims as herein provided if no such claim shall then have been filed. Neither such certificates of indebtedness nor such bonds shall be canceled in the event that a review should be prayed for or appeal taken from this order, nor until the time for praying such review or taking such appeal shall have expired; and in the event that this order should be reversed or should be so modified as to invalidate either bid or either sale in whole or in part, or to provide for the payment of the purchase price of either bid in any manner or upon any other terms than as in said bid contained, then the certificates of indebtedness of the receivers and the bonds of the bankrupt shall be by the receivers returned to the respective persons who shall have surrendered the same, and the rights of the owners thereof both as to principal and interest shall be in all respects revived and restored with the same effect as if said certificates of indebtedness and said bonds had never been surrendered.

"(6) This court retains jurisdiction of the cause and of the parties, and of the property and assets directed to be sold to the bondholders of the bankrupt, in order to enforce compliance with the terms of this order and to protect the rights of the parties to this proceeding. In the event of any controversy, the manner of determination of which is not herein provided for, the parties may present the controversy to this court or to the referee herein, and the receivers or the trustee may at any time apply to this court or to the referee for instructions with regard to their or his conduct in the premises."

Notice pursuant to the order was duly advertised, and was duly given to those entitled thereto.

The special master has made a painstaking inquiry into the merit and priority of claims, and, having reported, motion is now made to confirm that report, and for such other relief as may seem just. Confirmation is opposed by several merchandise creditors.

To understand clearly the somewhat difficult questions presented, it is desirable to follow the proceedings in chronological sequence. It is only in this way that the orders of court can be satisfactorily interpreted. When the bankrupt company was petitioned into bankruptcy, it was engaged in the fabrication of structural steel and iron work. It had long enjoyed a high reputation for efficiency and integrity. Its repute and business were well worth preserving as a good will asset. The petition having been filed March 20, 1909, receivers

were appointed by order dated that day and bearing file date two days later. They duly qualified, and authority was given to continue the business for 60 days.

By petition verified March 24, 1909, the receivers stated to the court as follows:

"Fifth. The company has outstanding contracts for work amounting to about $1,200,000, on some of which no work has as yet been done, while in others the work has reached various stages of completion. There are contracts aggregating in amount $780,816 for structural work to be performed in connection with the barge canal improvements for the state, and the remaining contracts are mainly for structural steelwork on buildings in the course of construction in the city of New York. Work has been wholly or partly suspended on practically all of said contracts for lack of funds necessary to provide the necessary labor. A part of the material necessary to complete the work under certain of said contracts is in stock, and as your petitioners are informed and believe, can, with moderate outlay, be worked into shape. It will be necessary from time to time to purchase additional raw material for fabrication, and your petitioners desire authority of this court to make such purchases on credit, on such terms as they may be able to secure. It has been estimated by an expert connected with one of the creditors of the company that there is an equity of at least $200,000 in said contracts. * * *"

"Seventh. It is absolutely necessary, therefore, that your petitioners should be authorized to negotiate immediately a temporary loan of at least $50,000 on such terms as to time of payment as they may be able to secure at 6 per cent. interest, in order that the property and assets committed to their care may be properly protected and preserved, and that the business of the company may be continued. It is the intention of your petitioners to apply as soon as possible to this court on proper notice for authority to issue receivers' certificates, to be a first lien on the property, ahead of the mortgage indebtedness, for the purpose of funding these temporary obligations, and also to provide additional working capital for the company, but in the present condition of affairs, and from lack of definite information necessary to present such an application, your petitioners desire authority to negotiate a temporary loan of at least $50,000.

"Wherefore, your petitioners pray that they may be authorized to borrow a sum not exceeding $50,000 at 6 per cent. and upon such terms as to time of payment as they may be able to secure, and to purchase materials upon credit; and, further, that they may be authorized to pay the accrued rent on the Cold Spring property, and the premises at 590 and 601 West Twenty-Sixth street, accrued taxes, and back wages of employés, and that they may have such other and further relief in the premises as may be just."

Summarized, this petition would be construed as stating: (a) That working capital was needed to pay off rent and taxes, failure to pay which might cause a stoppage of the plant and disorganize the working force. (b) That continuance of business with the aid of payments and reserve margins on contracts of the bankrupt would be at a profit rather than at a loss, so that there would be no question as to the future repayment of the moneys borrowed for working capital. (c) That it would be unnecessary to attempt to displace the lien of the mortgage bondholders, the unmortgaged assets coming to the hands of the receivers being ample security for the receivers' certificates. (d) That, as soon as possible, authority would be asked to issue receivers' certificates which were to be a first lien on the property and ahead of the mortgage indebtedness.

Upon this petition the court made an order on March 25, 1909, which contained the following provisions:

"Ordered that A. Gordan Murray and Michael Blake (receivers) be, and they hereby are, authorized and empowered to borrow $50,000 at 6 per cent. on such terms as to time of payment as they may be able to secure; and also to purchase necessary materials on credit; and it is further

"Ordered, that said receivers be, and they hereby are, authorized and directed to pay (1) the accrued and past-due rent on the Cold Spring property, * * * (2) the accrued and past-due rent on premises 590 and 601 West Twenty-Sixth street, * * * and all taxes on property owned or leased by the company; (3) the installment of rent on the Cold Spring property due April 1, 1909; * * * (4) all back wages due to workmen and other employés which would be entitled to priority under provisions of bankrupcy law; and it is further

"Ordered that said receivers be, and they hereby are, authorized to apply to this court for permission to issue receivers' certificates to fund the obligation hereinbefore authorized."

It will be noted that this order authorized the borrowing of $50,000, and also the purchase of materials on credit. The receivers borrowed only $25,000, and did not at once fund their loans by the issue of certificates as permitted by the order of March 25th. Later, on April 12, 1909, receivers filed a petition which contains the following statements and prayer:

"Second. Your petitioners on March 25, 1909, were by an order of this court authorized to borrow a sum not exceeding $50,000, with permission to apply thereafter for an issuance of receivers' certificates to fund the indebtedness incurred by virtue thereof.

"Third. Pursuant to the authority contained in such order, your petitioners purchased material necessary to enable them to carry on the business of the company and borrowed $25,000, a large part of which is still unused, and on deposit to the credit of their account. Bills for the material as purchased on credit will soon mature, and should be promptly met. Funds will have to be provided for this purpose, and also to pay for the materials ordered, but not yet delivered. It is also necessary for your petitioners to have sufficient working capital to enable them to purchase steel and other materials for the pending contracts, as soon as required, in order that they may proceed promptly with the prosecution of the work thereunder. Under practically all the contracts, payments are made to the company during the progress of the work, so that but a short time will elapse between the maturity of the bills for raw material and the time when payments will be made to the company on account of the work done. A number of contracts, on which little, if any work, has as yet been done, will soon become active, and ready funds will be needed to carry them out successfully. The weekly receipts, as your petitioners are informed and believe, should be more than sufficient to meet the pay rolls as they fall due, and provide for other fixed charges, such as rent, taxes, and insurance.

"Fourth. (Amount of bonds outstanding.)

"Fifth. Your petitioners are informed and believe that the good will of the company has a substantial value, and that it is to the best interest of the bondholders, secured and unsecured creditors, that the business should be continued as a going concern. It is as much for the preservation and protection of the bondholders that this should be done as it is for the interest of unsecured creditors. The security for the bonds will be protected by a continuance of operations, while under a liquidation the plant would bring nothing like its face value. Unless the contracts can be carried out, default will necessarily occur, thus subjecting the estate to large claims for damages.

"Sixth. Your petitioners are unable to state at this time just how much working capital they will require, but they are informed and believe that

201 F.—25

$250,000 will leave a safe margin. It is hoped and expected that it will not be necessary to use the greater part of this amount, but the permission of the court to issue certificates to that extent is sought, so that your petitioners can in their discretion borrow funds when and as the occasion arises. If the business is to continue, your petitioners will have to have authority to issue these certificates, and the amount above named has been determined upon by those connected with the company as furnishing a safe working basis. Collections are being pressed upon all of the outstanding accounts and bills receivable, and these will have to supply the working capital required. It will not be possible for your petitioners to raise funds necessary to operate the plant properly unless receivers' certificates are issued and declared to be liens upon the property and assets of the company prior to the lien of the general mortgage.

"Wherefore your petitioners pray that they may be given authority to issue receivers' certificates, bearing interest at the rate of 6 per cent., and upon such terms as to time of payment and otherwise as they may be able to secure, except that said certificates shall not mature at a date later than six months after the issue thereof, and that such certificates, when issued, shall be a lien upon all the property and assets of the company prior to the lien of the general mortgage dated March 1, 1903, to the United States Trust Company."

From this petition it is apparent that the receivers had examined the assets and studied the business as best they could. Their desire to issue receivers' certificates for a fixed sum indicated that they regarded that sum as adequate for all the purposes of their application. As indicated in the petition, there was a mortgage indebtedness. This was $660,000 in amount, and the trustee was the United States Mortgage & Trust Company.

The court, upon this petition, made its order dated April 14, 1909, as follows:

"On reading and filing the petition of A. Gordan Murray and Michael Blake, receivers of the above-named alleged bankrupt, verified April 8, 1909, praying that they be allowed to issue receivers' certificates to an amount not exceeding $250,000, to be a lien upon the property and assets of the alleged bankrupt prior to the lien of the general mortgage dated March 1, 1903, the affidavits of Irwin H. Cornell and of John M. Cornell, both verified April 8, 1909, the notice of motion dated April 9, 1909, with proof of due service thereof, together with a copy of the petition and accompanying affidavits upon the United States Mortgage & Trust Company, trustee under the general mortgage, Lemuel Skidmore, solicitor for the alleged bankrupt, John S. Huyler, Samuel W. Bowne, Carnegie Steel Company, and estate of Anderson Fowler, holders of certain of the company's bonds, secured by the general mortgage aforesaid, and on reading and filing the consents of S. K. Cornell, John M. Cornell, Mary C. Leffingwell, Sherman National Bank, Phœnix Iron Company, Bodine & Sons Company, and Carnegie Steel Company to the issuance of said certificates; and on reading and filing the answer of the United States Mortgage & Trust Company, verified April 12, 1909, and upon all the papers and proceedings in this matter, and after hearing Morgan J. O'Brien, of counsel for the receivers, in support of said motion, and William Greenough, of counsel, for the United States Mortgage & Trust Company, opposed, and John D. Beals, of counsel for John S. Huyler, Samuel W. Bowne, and the estate of Anderson Fowler, and William B. Symmes, Jr., of counsel for John M. Cornell and S. K. Cornell, appearing and joining in the prayer of the petition, and it further appearing that $630,000 out of $660,000 of the bonds issued and outstanding under the general mortgage, consent to the granting of this application, and counsel for the receivers having consented in open court to reduce the amount of the application from $250,000 to $100,000, with permission to apply hereafter for authority to issue certificates for the balance, and due notice of the settlement of this order having been given, it is, on motion of

O'Brien, Boardman, Platt & Littleton, solicitors for the receivers, ordered that A. Gordan Murray and Michael Blake, as receivers of J. B. & J. M. Cornell Company, be, and they hereby are, authorized and empowered to issue their certificates of indebtedness to an amount not exceeding the sum of one hundred thousand dollars ($100,000) for the purpose of providing working capital, so as to enable them to carry out and complete the outstanding contracts of the company, and undertake new business, and to protect and preserve the assets and property in their hands, and

"It is further ordered that said certificates shall bear interest at the rate of not to exceed six per cent. (6%) per annum, and shall be issued upon such terms as to time of payment as the receivers may determine, except that they shall mature not later than six months from their date. Said certificates shall be substantially in the form annexed hereto and marked 'Schedule A,' and may be sold by the receivers, for cash, or for materials delivered, or may be pledged by them to secure the payment for necessary materials ordered, but said certificates shall not be sold for less than the par value thereof. So much of said certificates as may be necessary shall be used to redeem any and all outstanding notes or certificates issued by the receivers pursuant to the order of this court dated March 25, 1909, and

"It is further ordered that said certificates, to the amount of the principal and interest thereof, shall constitute a lien upon all the property and assets, of every nature and description, of the J. B. & J. M. Cornell Company, and upon all net earnings and profits derived from the pending contracts or which may hereafter result from the conduct of the business of the company in charge of said receivers, which lien shall be prior to the lien of the general mortgage, dated March 1, 1903, made by J. B. & J. M. Cornell Company to the United States Mortgage & Trust Company, as trustee. The net profits and income derived from pending contracts or contracts which may be hereafter undertaken shall be primarily charged with the lien of all certificates, and the interest thereon, issued under this order. If the net income and profits derived from said contracts be insufficient to provide for the payment of said certificates, and the interest thereon, or any part thereof, the assets and property of the company not covered by the general mortgage shall be resorted to for the payment thereof. If either of the above-mentioned funds shall be insufficient to provide for the payment of the principal and interest of said certificates, or any part thereof, they shall be payable out of the property and assets of the company covered by the general mortgage as aforesaid.

"The receivers are authorized to apply to this court for permission to issue additional certificates to the extent of one hundred and fifty thousand dollars ($150,000) when and as the occasion may arise."

From this order it appears that (a) the consent was obtained from all the bondholders to issue receivers' certificates (the $30,000 outstanding having been taken care of in due course); (b) the receivers through counsel consented to reduce the amount of certificates from $250,000 as asked for to $100,000; (c) the lien accorded to the certificates was carefully and clearly set forth; (d) further application might be made for the issuance of additional certificates to the extent of $150,000 when and as needed. Let us stop here on April 14, 1909, to consider the rights of the bondholders and of the purchasers of these receivers' certificates designated as series A.

[1] The lien of bondholders of an industrial corporation, indeed, of any but a so-called public service corporation, cannot be displaced without their explicit consent. A moment's consideration will show the fundamental wisdom of this rule. A mortgage loan to an industrial corporation is made upon the security of its property. It does not differ in principle from a loan on real or personal property. (Here

the mortgage was on real property, chattels, real and personal property then owned, and to be after acquired. Income was merely incidental.) Such a mortgage is rarely made, as are some railroad loans, on income in part or in whole. The lender is dealing with a strictly commercial proposition. He looks to the plant, the property real and personal, and, generally speaking, has in mind what the plant will sell for under the hammer. He is not concerned, and should not be asked to be concerned with the success of the business thereafter. If the business fails, he has the right to repose on his judgment of the value of tangible things, and he is not remitted to the possibility of earning power or other elements of personal equation. Having made his loan, he may rest easy until the day of reckoning, and then, out of the tangible assets, if his judgment was good, he recoups his investment, and, if not, he takes his loss. No court without his consent can lessen his security a dollar's worth. It is true (and on this head many authorities are cited by objecting merchandise creditors) that insolvent public service corporations come under another rule. But, there again, experience and good sense come into play. Without detailing all the reasons, it may be said that the authority to displace bondholders' liens in the case of public service corporations rests broadly on two propositions: (1) The necessity of conserving the convenience of the public by preventing the stopping of transportation of passengers or freight on land or water or both, and (2) the necessity of preserving franchises, the saving of which obviously must inure to the benefit of the bondholders. But, if it ever be declared that the lien of the bondholders of an industrial corporation may be displaced, without consent by a court order, the result would be that such corporations could not obtain loans from responsible institutions or investors, hence disaster and a destructive blow at legitimate business enterprises.

[2] So, too, with receivers' certificates when properly and carefully issued. The receivers' certificate is defined within the corners of the court's order, aided, in interpretation, somewhat by the petition on which issued and such other documentary evidence as may be relevant. The investor in receivers' certificates is usually the banker, individual or institution. His or its profit is the interest on the investment. He or it risks the output for a fixed interest return. If such an investor reads the court's order correctly, and it provides that the certificates shall be a lien on the property of the estate, there is no further responsibility placed upon him. He is not called upon to watch what happens thereafter. He has made his loan, risked his money on the terms of an order of court, and, if his security is good, it is a matter of indifference to him what thereafter happens. Thus, when the New York Trust Company in this case bought the certificates issued under the authority hereinbefore set forth, it had the right to rely upon the representations of the petition and upon the force of the court's order. The certificates were constituted "a lien upon all the property and assets of every nature and description" of the bankrupt, " * * * which lien shall be prior to the lien" of the general mortgage. It was unnecessary to provide that the

certificates were a "first" lien because obviously, if they were to be ahead of the mortgage, they would be a first lien.

Not for the purpose of protecting the purchasers of these certificates, but to assure an equitable plan of liquidation, the order provided a method of marshaling the claims of the certificate holders, so that they might be collected, in order, out of (1) the net profits and income of the pending or new contracts; (2) the personal property not covered by the mortgage; (3) the real and personal property covered by the mortgage. Any merchant thereafter selling goods to the receivers was charged with the knowledge that the mortgage debt and the series A receivers' certificates were prior to his claims, and, under such circumstances, he took his chances as to whether the enterprise would work out so that his bill would be paid. The purchaser of series A, on the other hand, could only lose its lien by formal consent or by acquiescent conduct equivalent to estoppel. Neither is to be found. In view of the situation in the spring of 1909, the receivers were keen to preserve what they had the right to believe was a valuable business and plant, and they applied for further extensions to do business, and the court granted these applications for an aggregate period of 150 days, until we come to the issue of the so-called series B certificates.

The first order dated March 20, 1909, appointing the receivers, authorized them to continue business for 60 days. The next order (March 25, 1909, supra) not only authorized the borrowing of $50,000, but also the purchase of necessary materials on credit. At the expiration of the 60 days, for the continuance of business as provided in the order of March 20, 1909, an order was made dated May 19, 1909, as follows:

"It is ordered that A. Gordan Murray and Michael Blake, receivers of the above-named alleged bankrupt, be, and they hereby are, authorized and empowered to continue the business of the J. B. & J. M. Cornell Company for a further period of 30 days, *with all of the powers heretofore conferred upon them*."

The orders of June 18, 1909 (60 days), and of August 17, 1909 (60 days), are in substantially the same form, and empower the receivers to continue the business "with all of the powers heretofore conferred upon them."

[3] Thus the power conferred by the order of March 25, 1909, was continued in each and every order thereafter made which authorized the continuance of the business. The order of October 15, 1909, providing for the issuance of the so-called series B certificates, is as follows:

"On reading and filing the annexed petition of A. Gordan Murray and Michael Blake, receivers of the above-named alleged bankrupt, the annexed petition of Bethlehem Steel Company, the annexed affidavit of John M. Cornell, all verified October 14, 1909, and the stipulation of Lemuel Skidmore, Esq., solicitor for the alleged bankrupt, consenting to the entry of this order, and on motion of O'Brien, Boardman, Platt & Littleton, solicitors for the petitioning creditors and the receivers, it is ordered that A. Gordan Murray and Michael Blake, as receivers of the above-named alleged bankrupt, be, and they hereby are, authorized and empowered to continue the business of J. B.

& J. M. Cornell Company for a further period of four months with all 'the powers heretofore conferred upon them.

"It is further ordered that said receivers be, and they hereby are, authorized and empowered to borrow a sum or sums of money not exceeding the sum of $100,000, in addition to the sum of $100,000 heretofore authorized by an order of this court dated April 14, 1909, at not to exceed 6 per cent. interest, and upon such terms as to time of payment as they may be able to secure, for the purpose of providing additional working capital for the conduct of the business and to protect and preserve the assets and property in their hands.

"And it is further ordered that said receivers be, and they hereby are, authorized and empowered to issue their certificates of indebtedness therefor in such denominations and numbers as they may in their discretion determine, and sell the same, or any part thereof, for cash; but said certificates shall not be sold for less than the par value thereof."

Upon the issuance of this order, and the amendatory order of October 22, 1909, I am unable to discover either (1) consent of the bondholders or (2) provision for any lien whatsoever on the property or income of the bankrupt. The order itself does not so provide. The purchaser of these certificates was put on notice that there was not any consent of the bondholders to the issuance of the cer-. tificates, and also that the receivers were authorized to purchase necessary materials on credit.

It is claimed by the certificate holders of series B that this order of October 15, 1909, must be regarded as at the foot of the order of April 14, 1909, but that claim is without merit. The order does not so state nor could it be at the foot of the order of April, 1909, without the consent of the bondholders, and that consent was not given.[1]

What, then, was the situation on October 15, 1909? The petition of the receivers upon which the order was based showed that the receivers had contracted bills for materials necessary in the prosecution of the work under various contracts and these bills were rapidly maturing. (Petition of receivers dated October 14, 1909, paragraph 3.) The receivers set forth that it was difficult to ascertain the exact condition of the receivership; that the $100,000 of series A certificates were still outstanding; that it had been stated that the reorganization of the affairs of the company was probable; and that they, the receivers, believed that the business should be kept alive pending the culmination of efforts in that direction; and that they recommended that authority be given to them to borrow $100,000 as additional capital, and that they be empowered to continue the business of the company for a further period of four months with all the powers theretofore conferred upon them (petition October 14, 1909, supra, paragraphs 3, 4, 5). At this time it is also apparent that the weekly pay roll requiring liquid cash ran into large figures, and that both cash money and credit for materials were necessary if the business were to be kept as a going concern until a reorganization was effectuated. If the order of October 15, 1909, or the order of October 22, 1909, authorizing the issue of the series B certificates, had

---

[1] Note.—The position of the bondholders is stated in answer of United States Mortgage & Trust Company, dated November 12, 1910, and especially in paragraph 11 thereof.

provided a lien for these certificates, then the series B certificates would have been in the same position as to after-contracted debts as were the series A certificates.

[4] But the orders of October 15 and October 22, 1909, made no provision for a lien, and I am unable to see how the series B certificates represent an indebtedness any different in principle from the indebtedness to merchants who sold goods on credit. In the one case the banker individual loaned money without security, and in the other case the merchant sold his goods on credit without security. Both must be presumed to have known the orders of court and the character of the credit. Being the same in principle, these two classes were on a parity, and neither could expect priority over the other. If, therefore, the debts of the objecting merchandise creditors had been contracted by the receivers prior to the expiration of the four months on February 15, 1910, the question under consideration would not be hard of solution.

Some of the claims of the objecting merchandise creditors arose as late as February, 1911, and it is urged on behalf of the holder of series B certificates that, in any event, payment of these certificates must be made prior to claims arising subsequent to February 15, 1910. Orders subsequent to February 15, 1910, authorizing the receivers to do business "with all the powers hereafter conferred upon them," were made as follows: February 6, 1910 (4 months); June 16, 1910 (3 months); and September 16, 1910 (60 days). Upon a petition verified October 31, 1910, the receivers moved for leave to sell the property and assets of the bankrupt. This motion was strenuously contested, as appears from the papers and from the memorandum of Judge Hough, dated November 22, 1910. Among those in opposition was John M. Cornell, who in his affidavit verified November 19, 1910, clearly showed that he represented his wife, who was then the owner of the series B certificates. Mr. Cornell had been the president of the bankrupt, and prior to its incorporation the owner of the business, and had been employed by the receivers for a considerable period as the general manager for them. Presumably no more could be more familiar with the situation. His affidavit indicates beyond question that, when the money was loaned for which the series B certificates were issued, Mrs. Cornell and her husband expected this business to be continued, not merely for four months, but until such time as a reorganization would be accomplished.

Attention is especially called to paragraph 3 of the affidavit as follows:

"(3) That when he and his said wife consented to the borrowing by the said receivers of $200,000 upon their certificates, both he and his said wife understood that the purpose of such loan was to enable the receivers to work out to payment certain contracts entered into by the J. B. & J. M. Cornell Company for the erection of bridges on the state barge canal and other contracts in order that the company might be kept a going concern to the end of reorganization and the obtaining of reserved percentages upon these contracts. He is informed and believes that the other bondholders who consented to the borrowing of said two hundred thousand dollars ($200,000) by the receivers and the committee of unsecured creditors consented for a like purpose."

In paragraph 12 Mr. Cornell shows from his point of view that the business should be continued for a few months, and, in short, this affidavit makes clear beyond peradventure that Mrs. Cornell invested this money in these series B certificates, not alone with the knowledge that the business might be continued beyond the four months, but with the expectation that, if necessary, it would be continued so as to keep it alive as a going concern if the reorganization was not consummated within the four months. In the order of December 19, 1910, denying the receivers' petition for leave to sell, Mrs. Cornell is recited as in opposition, and so her attitude was understood by Judge Hough, as appears from his memorandum above referred to. The assignment of these certificates to the present holder was not made until June, 1911, and its status is necessarily that of its assignor. The order to show cause of October 31, 1910, authorized the receivers to continue the business of the bankrupt and the performance of certain contracts until the disposition of the motion, and in the order of December 19, 1910, deciding the motion, authority was further given "to continue work upon such contracts now in the course of performance * * * as in the opinion of said receivers it may be advisable and profitable for said receivers to complete." And, finally, by order of March 28, 1911, the receivers were empowered to continue the business "with all the powers theretofore granted to them" and to proceed with the contracts which they had under way until further order of the court. Thus authority was conferred upon the receivers to make purchases of goods on credit for which the various claims have been filed.

In determining the equities, it must be remembered that this is not one of those cases where the court specifically limited the receivers as to the amount of credit, but the case is in many particulars similar to those which are constantly arising in this district. It is well known in this district that authority to do business is granted from time to time in order to give receivers an opportunity to save a business as a going concern, and to develop the situation, and that the granting of one extension does not imply that further extensions will not be granted. It would be destructive of the effort of the court to save a business in an important commercial community to hold that if there was an extension, for instance, to do business for thirty days, the merchandise creditors who sold goods on credit, within that period, must be paid before the merchandise creditors who sold goods in a succeeding period during which receivers were duly authorized to do business and buy on credit. How can the court or any one else know how long the business should be continued? As each period draws to a close, the court, upon a proper showing, makes further orders, and everybody knows, or should know, this practice—justified from a practical standpoint by the necessities of the case. The merchandise creditor who, to illustrate, has sold goods during the first period, may, at any time, oppose the granting of a further extension on the ground that continuance of the business will result in waste or imperil his claim. But, when he sells to the receivers, he takes all the hazard that the court may further extend the time to do business, and, if he does

not like that kind of a hazard, he need not sell his goods. To hold otherwise would as effectually cripple the efforts of the bankruptcy court to rescue a valuable plant and business as to hold that receivers' certificates, providing for a lien, were to be on a parity with subsequent debts. If I am right in this conclusion, the series B certificates have no better footing than the merchandise claims, because, as heretofore pointed out, the money was lent without security and on precisely the same basis as the goods were sold on credit. If the series B certificate holders at any time were fearful that collection at par was being imperiled, they could have made application to the court, but they took a contrary position. Under all the circumstances, I hold that equity requires the holder of certificates series B and the merchandise creditors to be treated alike.

Finally, it is urged that the claim of the Davies & Thomas Company, for goods sold between July and December, 1909, should not be paid, but that they should look to the receivers. The record shows that both the receivers and these claimants did all that each could be expected to do in the premises. The receivers having resisted payment, suit was brought and judgment recovered by the Davies & Thomas Company against the receivers. An order was made in March, 1911, enjoining the issuance of an execution; the judge stating that this creditor must wait and be treated like other creditors of the same class. A motion for an order directing the receivers to pay the judgment was denied, and certainly, under these circumstances, this claimant is entitled to the same standing as the other merchandise creditors, and as the series B certificate holders.

Briefly, to summarize, the order of priority is fixed as follows: (1) All taxes due; (2) cost of administration; (3) claim of New York Trust Company as holder of certificates series A; (4) claims of bondholders of bankrupt; (5) claim of Sarah K. Cornell as holder of certificates series B, and claims of merchandise creditors enumerated in special master's report under paragraph 6; (6) claims for damages for breach of contract; (7) claims for injuries. June 9, 1911, is fixed as the interest-due date because that is the date of the order authorizing acceptance of the bids. Except as herein indicated, and except as to some details noted in my June memoranda, the report of the special master is in all respects confirmed. Notice of settlement of order should be on five days' notice.