## FELDMAN v. AMERICAN PALESTINE LINE, Inc.

## THE PRESIDENT ARTHUR.

(District Court, S. D. New York. July 16, 1926.)

Receivers ⚖154(1)—Court having taken possession of vessel in creditor's suit, compensation and expenses of receiver and counsel held payable from proceeds of sale as against claimants of maritime liens.

A vessel was seized in a creditor's suit in equity against the owner, and possession taken by the receiver. Afterward the court permitted libels to be filed against the vessel in admiralty by lien claimants and process served, and possession was held thereafter by him and the marshal jointly. Expenses were incurred by the receiver in the repairing and care of the vessel, all of which were necessary and valuable for its preservation. Valuable services were also rendered by his counsel. By order of the court, the vessel was sold by the receiver and marshal jointly. Held, that the expenses of the receiver, his compensation, and fees of his counsel, were allowable from proceeds of the sale as having priority over claims of the maritime lienors.

In Equity. Suit by Morrison J. Feldman against the American Palestine Line, Inc. Also admiralty suits, consolidated therewith, against the steamship President Arthur. On motion of the receiver in the equity suit for allowances to him and his counsel for services and disbursements from the fund realized from sale of the vessel. Motion granted.

This is a motion for allowances out of the proceeds of the sale of the President Arthur, now in the registry of the court, to the receiver and his counsel for their services and disbursements in connection with the custody, care, and sale of the vessel.

Lampke & Stein, of New York City (Chauncey E. Treadwell, of New York City, of counsel), for receivers.

Carter & Phillips, of New York City (Peter S. Carter, of New York City, of counsel), for master and other officers of the steamship President Arthur.

Haight, Smith, Griffin & Deming, of New York City (Stanley W. Schaefer, of New York City, of counsel), for Tietjen & Lang Dry Dock Co. and Todd Dry Dock Engineering & Repair Co.

THACHER, District Judge. On September 11, 1925, Lawrence S. Greenbaum was appointed receiver in equity of American Palestine Line, Inc., in the above-entitled equity cause, which is the usual creditors' bill. The American Palestine Line was the owner of the steamship President Arthur, a trans-Atlantic passenger steamer of about 20,000 tons' displacement. At the time of the receiver's appointment she was on the high seas bound for New York. On her arrival at quarantine on September 15, 1925, the receiver took possession and from that moment she was and remained in the custody of the court. Prior to her arrival in port, libels had been filed in this court. No process thereon, however, was served until after the receiver had taken possession. On the following day, September 16, 1925, with the permission of the court, the marshal served process under a libel theretofore filed, and thereafter the court permitted the filing of other libels. There has been no order entered permitting or directing the marshal to interfere with the custody of the receiver, except that with the permission of the court process upon various libels has been issued to and served by the marshal. There has been no controversy in regard to the right of the marshal or the receiver to the exclusive possession of the ship. Her care and custody has not been exclusively intrusted to either, and the orders which have been entered from time to time, both in the equity and in the admiralty cause, have recognized a joint control of the vessel by the receiver and the marshal. From these orders no appeals were taken. Maritime lienors have been permitted to file their libels against the ves-

sel in the custody of the court, and to proceed with the prosecution of their claims in admiralty; all of these libels being joined in a consolidated cause, and the issues under the various libels and answers thereto being referred by consent of the parties to a single commissioner. The order under which the vessel was sold provided for a joint sale by the receiver and by the marshal, and the bills of sale delivered pursuant to the order confirming the sale were executed jointly by the receiver and the marshal. The application now made for allowances relates to the services of the receiver and his counsel in connecnection with the care, custody, and sale of the vessel.

It is contended in behalf of the objecting maritime lienors that, whatever the value and necessity of the services rendered may have been, this court is without power to grant any allowance from the fund realized from the sale of the vessel. It is further contended that the services rendered were entirely unnecessary for the preservation of the property and were in no way beneficial to the maritime lienors. With the latter contention I cannot agree. When the vessel arrived in port, she was in a serious leaking condition, and it was necessary to continuously work her pumps to keep her afloat until she could be dry-docked and repaired. Because of her size, only two dry-docks in this port could accommodate her. After arranging for the discharge of her passengers and freight, and ascertaining her condition, the receiver and his counsel immediately entered into negotiations with the owners of these two dry-docks in order that the repairs might be made without delay. The owner of one refused to undertake the work, as it was engaged in litigation with the company. The owner of the other refused to undertake the work without security. The receiver was without funds or other security satisfactory to the Dry-Dock Company. He promptly endeavored to arrange with the underwriters, who were presumed to be liable for the cost of repairs, for the payment by them of the repair bill directly to the Dry-Dock Company. This the underwriters refused to do. The receiver then attempted to arrange an assignment of the insurance, but the broker who had placed it claimed a lien for unpaid premiums, and it was necessary to renew negotiations with the Dry-Dock Company in an effort to persuade it to withdraw its refusal to undertake the work without security.

After considerable difficulty, these negotiations finally resulted in a contract which was submitted to and approved by the court; an order being made requiring payment for the repairs as a preferred charge from the proceeds of the sale of the vessel. The negotiations were difficult, valuable, and important in preserving the vessel, and required constant and careful attention of the receiver and his counsel. The bill of the Dry-Dock Company was subsequently paid out of the proceeds of sale as a legitimate expense incurred in the preservation of the res. The services rendered by the receiver and his counsel in this connection were quite as necessary in the preservation of the ship as the actual performance of the work which was done by the Dry-Dock Company. Many libels were filed against the vessel. These matters required the attention of counsel for the receiver, who were quite justified in investigating the claims asserted and interposing such defenses as might be available, since the number and amount of maritime lien claims were not known, nor could the value of the ship realizable upon sale be ascertained, and it was the duty of the receiver and his counsel to oppose such claims for the benefit of all the creditors. When the vessel came off drydock, arrangements were made by the receiver and the marshal for wharfage at reasonable rates. The care and custody of the vessel was not a matter for which the marshal's office was adequately equipped, since it was necessary, in order to prevent damage from freezing, to keep steam up and to have on board a force of men much greater than the ordinary watchmen usually employed. The question of paying these men was a constant difficulty, and the receiver and his counsel were active in meeting their demands.

The receiver and his counsel are criticized for having co-operated in the efforts of the reorganization committee to effectuate a plan of reorganization which would have been distinctly advantageous to the maritime lienors. In co-operating with these efforts, the receiver did not, as is claimed, delay the sale of the vessel and thereby incur unnecessary expense. The vessel was sold quite as promptly as reasonable consideration of the circumstances permitted. The reorganization committee made one request for an adjournment of the sale at a hearing upon notice to all creditors. The request was granted without opposition from any maritime lienor, although the receiver plainly stated the necessity for a prompt sale in order to avoid the cost of continuing to keep an idle ship. The receiver and his counsel were active in arranging for the entry of the decree under which the ves-

sel was finally sold, and at the same time in opposing the entry of decrees in other cases not regarded as meritorious. They were also active in endeavoring to find a purchaser for the vessel and in arranging for a sale under circumstances which might assure the realization of the highest possible price. I am entirely satisfied that the services rendered were necessary and valuable in preserving the vessel, and in realizing upon its sale a substantial sum, and that these services did inure to the benefit of the maritime lienors. After the sale had been confirmed, the purchaser failed to make good his bid until proceedings were commenced by the receiver's counsel to punish him for contempt. The amount realized on the sale of the ship was $130,000.

The services rendered by the receiver and his counsel were of a character which could hardly have been efficiently rendered by the marshal without assistance. I am satisfied that the statement of the deputy United States marshal, who has had long experience in such matters, to the effect that the work involved in the proper maintenance, care, custody, protection, and successful sale of this vessel has rarely been equaled for difficulty, and in its requirements for continuous, painstaking and successful work. He states that it was quite beyond the facilities of the marshal's office to have alone successfully coped with these requirements. In all of this work the receiver's counsel constantly conferred with the court and with the approval of the court took the responsible lead in what was done to preserve the vessel, the marshal's office assisting and co-operating therein.

In rendering these services, the receiver was not in any sense a volunteer. His possession was prior to that of the marshal. And, in permitting libels to be filed and process to be issued thereon, the court did not intend to terminate the services of the receiver and his counsel in connection with the care, custody, and ultimate sale of the ship. The situation, I think, was made plain to the maritime lienors in the orders which were entered from time to time, particularly in the order of sale, which expressly provided for a joint sale by the receiver and the marshal. When the original process in admiralty was executed by the marshal, the vessel was already in custodia legis, and without the permission of the court this custody could not be interfered with. Taylor et al. v. Carryl, 20 How. 583, 15 L. Ed. 1028; In re Hughes (D. C.) 170 F. 809; The Falcon, 177 F. 916, 101 C. C. A. 196; Lamprecht v. Cleveland-Erieau Steamship Co. (D. C.) 291 F. 876;

In re People's Mail Steamship Co., 19 Fed. Cas. p. 211, No. 10970.

In the Hughes Case, supra, it was held that vessels in the possession of a receiver in bankruptcy could not be taken by the marshal in admiralty proceedings without the consent of the bankruptcy court, and that, if by such consent they were taken and sold in suits to enforce maritime liens, the proceeds were subject to the necessary costs incurred by the receiver in preserving the property, including proper allowances to the receiver and his counsel. This decision was affirmed in the Circuit Court of Appeals for the Third Circuit. The Falcon, supra. It was said in the Hughes Case: "The court consented to the sale of these vessels in admiralty for the purpose of avoiding protracted and expensive litigation; but it did not release the vessels from the charges justly and necessarily incurred in caring for them before the surrender to the marshal." In the instant case, the vessel was already in the custody of the court when the process in admiralty was issued. The libels were filed and the processes were allowed to be issued, but there was no change of custody. The receiver remained in possession, and, assisted by the marshal, continued to care for and protect the property. There was no objection to this course of procedure, although it was made plain in orders which were entered from time to time.

In The Bethulia (D. C.) 200 F. 879, an allowance was made to a trustee in bankruptcy from the proceeds of a sale of the vessel in admiralty for his care and custody of the vessel pending the determination of the lien claims and for his services in opposing such claims. This allowance was made, although the fund in admiralty was sufficient to pay only part of the maritime liens. In this connection the court said:

"The hearing had to determine the validity of lien claims asserted has resulted in showing that no interest of any value in the steamer, over and above the valid incumbrances, passed to the trustee. If he could have foreseen this result with reasonable certainty when the owner's bankruptcy was declared, the trustee would not have been justified in setting up any claim to the steamer as part of the estate, or intervening to oppose the lien claims. Under the circumstances then existing, however, he could not have been expected to tell whether any, or which, liens were valid, and he was therefore justified in his intervention to contest the claims, and in assuming possession, care, and custody of the steamer pending their determination. The holders of the lien claims held valid are thus

properly required to bear their share of the charges and expenses incurred or due for the purposes of this provisional custody; but as to charges not so incurred or due, though incurred in the administration of the estate as a whole, justice seems to me to require that they should be borne by the unsecured creditors (except where other vessels of the bankrupt in the like situation are involved), because they concern property to be administered for the unsecured creditors' benefit, as these do not."

The Wabash (D. C.) 279 F. 921, and The Washington (D. C.) 296 F. 158, are the only decisions cited in support of the contention that the court is without power to make the allowances requested. Each of these cases involved an attempt to charge against the proceeds of the sale of a vessel in admiralty the receiver's expenditures in operating the vessel in an attempt to make a profit for the general creditors. Such charges were clearly not necessary to preserve the property, and could not benefit the lien claimants, as they had no possible interest in the operation of the vessel. The decision in American Engineering Co. v. Metropolitan By-Products Co. (C. C. A.) 275 F. 34, is to the same effect. From all of these decisions the present case is distinguishable because the receiver did not undertake to carry on the business of the American Palestine Line. The services and disbursements here involved were not rendered and incurred in connection with an unsuccessful attempt to carry on a business for the benefit of general creditors, but were rendered and incurred for the actual preservation of the property, the proceeds of which have been deposited in the registry of the court.

The receiver's petition shows an unpaid balance of disbursements in preserving the vessel of $1,588.02. In connection with the contempt proceedings against the purchaser, the receiver's counsel has been allowed a fee of $1,500, the payment of which was imposed upon the purchaser. The services rendered by counsel in this connection were rendered as counsel for the receiver. In order to compel the purchaser to complete his bid, they were, in my judgment, of great value to the maritime lienors; but, in view of the allowance made out of the fund deposited by the purchaser, I regard these services as paid by that allowance.

Orders may be entered directing payment out of the funds in the registry of the court of $4,588.02 to the receiver for his services and disbursements, and of $5,000 to the receiver's counsel for the balance of their services and disbursements.