### AMERICAN ENGINEERING CO. v. METROPOLITAN BY-PRODUCTS CO., Inc. (four appeals).*

(Circuit Court of Appeals, Second Circuit. June 23, 1921.)

No. 261.

1. **Receivers ⚖️128—Prior lien creditors held not to lose right to foreclose by reason of acquiescence in issuance of receivers' certificates.**

    Prior lien creditors of a private corporation engaged in the disposal of garbage under a contract with a city could not be deprived of their liens because they did not appear and object, and appeal if their objections were overruled, to a continuation of the business after appointment of a receiver without their express consent, the business being continued by the receiver, and the certificates being issued by him under the mistaken belief of creditors that the business would become profitable, though it was ordered by the court that the receivers' certificates should be a prior lien.

2. **Receivers ⚖️128—Equities held in favor of prior lien creditors as against receivers' creditors.**

    In a receivership proceeding, prior equities *held* in favor of prior lien creditors who advanced their money to build a garbage disposal plant upon an express agreement for liens, as against receiver's creditors who advanced money for the continuation of the business after appointment of the receiver under the belief that the business would become profitable.

3. **Corporations ⚖️477(1)—Void provision in agreement held severable so as not to affect right of mortgagee to enforce lien.**

    A provision in an agreement as to prior lien on property of private corporation engaged in disposal of city garbage, whereby the contract with the city was mortgaged, which was void as against public policy, *held* entirely severable so as not to affect right of mortgagee to enforce its lien on the property and funds; the moneys secured by the mortgage being honestly loaned and applied in building the mortgagor's plant.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit by the American Engineering Company against the Metropolitan By-Products Company, Inc. From a decree distributing the fund

---

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 256 U. S. —, 42 Sup. Ct. 94, 66 L. Ed. —.

after appointment of receiver, the Title Guarantee & Trust Company, as trustee, the Columbia Trust Company, as trustee, Frank Bailey and others, as a committee of bond holders and preferred note holders, and Robert H. Davis and another, as a committee of general creditors, appeal. Reversed, with directions.

See, also, 267 Fed. 90; 275 Fed. 40.

Davison & Underhill and Oscar A. Lewis, of Brooklyn, N. Y. (Alfred T. Davison and Harold C. McCollom, both of New York City, of counsel), for appellants Title Guarantee & Trust Co., Columbia Trust Co., and Bailey and others.

Deiches & Goldwater, of New York City (Robert H. McCarter, of Newark, N. J., and Maurice Deiches, of New York City, of counsel), for appellant Davis.

Charles A. Brodek, of New York City, for committee of general creditors.

Lewis & Kelsey, of New York City (Frederick T. Kelsey and Wallace T. Stock, both of New York City, of counsel), for appellees receiver of Metropolitan By-Products Co. and others.

John P. O'Brien, of New York City (Josiah A. Stover, of New York City, of counsel), for appellee city of New York.

Shearman & Sterling, of New York City, for appellee International Bank.

Ferdinand I. Haber, of New York City, for appellee Cobwell Corporation.

Before WARD, ROGERS, and MANTON, Circuit Judges.

WARD, Circuit Judge. December 22, 1915, the city of New York advertised for bids for a contract to dispose of its garbage for five years.

April 1st the firm of Gaffney, Gahagan & Van Etten arranged with the banking firm of J. H. McClement & Co. that if they were awarded the contract by the city they would organize a company to carry it out, and the bankers agreed to buy $1,000,000 of the first mortgage bonds of the company for $950,000 and to sell second mortgage bonds to the amount of $800,000 for cash. For the protection of the bondholders it was further agreed that the bankers or a trust company named by them should constitute a voting trust of a majority of the company's stock, so putting them or it in control of the directorate. The bankers named the Title Guarantee & Trust Company as voting trustee.

April 10, 1916, the city did enter into a contract with the Gaffney firm, who organized the Metropolitan By-Products Company, Inc., to carry it out, the Street Cleaning Commissioner assenting to the assignment of the contract to the Metropolitan Company. The bankers did take the $1,000,000 of bonds secured by a first mortgage to the Title Guarantee & Trust Company, trustee, dated July 2, 1916, and did sell $832,000 of bonds secured by a second mortgage of the same date to the Central Trust Company, trustee.

November 28th, because of delays in completing its plant, the Metropolitan Company leased the garbage plant of the New York Sanitary

Utilization Company on Barren Island for two years, and deposited securities of the value of $202,000 with the Central Union Trust Company as collateral to a bond given by the Metropolitan Company to the Sanitary Company for the faithful performance of its covenants under the lease. There is a surplus of about $128,000 in this fund.

September 1, 1917, the Metropolitan Company, being in dire need of funds, executed a mortgage to the Central Trust Company, for which the Columbia Trust Company was substituted, to secure $500,000 of bonds, of which $359,200 were issued, to which mortgage the second mortgage to the Central Trust Company, dated July 2, 1916, was by agreement subordinated.

May 22 to November 15, 1917, various parties advanced moneys to the amount of $290,000 and the holders of the bonds under the second and third mortgages subordinated those mortgages to the claims of these noteholders.

November 19, 1917, the American Engineering Company filed its bill against the Metropolitan Company, which had been operating its Staten Island plant since May, 1917; asking for the appointment of a receiver, not to wind up the corporation and distribute its assets among its creditors, but—

"that this court will forthwith appoint a receiver of all and singular the property and assets of defendant, of every nature, wheresoever held, owned, or controlled by defendant, with full power to manage and operate the same and to continue and conduct the business of defendant under direction of this court, with power to employ, discharge, and fix the compensation of managers, agents, and employees, with power to incur such expenses and make such payments as may be necessary or advisable in connection therewith, with power to purchase for cash or on credit such supplies, materials, or other property as may be advisable, and to borrow the necessary funds to meet pay rolls, purchases of property and expenses in continuing and conducting said business; to collect and receive all moneys and property; to institute, prosecute, intervene in, continue or defend any suits, actions or proceedings at law or in equity concerning any of defendant's property or assets, to make allowance upon or otherwise adjust any claims of or against defendant, and with the usual powers of receivers."

On the same day the company appeared, admitted the allegations of the bill, and consented to the appointment of receivers. On the same day the court appointed receivers, the order including the following:

"Ordered, adjudged and decreed that the said receivers are, until further order of this court, hereby fully authorized to take immediate possession of the said properties and assets, and to manage and operate the same, and to continue and conduct the business of defendant in their own discretion, until the further order of this court, and to do all and any such things as may be necessary to preserve and protect such properties, assets and business, with full power to employ, discharge and fix the compensation of managers, agents and employees, to incur such expenses and make such demands as may be needful in connection with the administration of their trust and the continuance and conduct of the business of the defendant; to continue the performance of the present contract of defendant with the city of New York for the disposal of the garbage of the boroughs of Manhattan, The Bronx, and Brooklyn; to purchase for cash or on credit such supplies, material, or other property as may be advisable, with leave to apply to court for authority to negotiate receivers' certificates and borrow funds to meet pay rolls, purchases of materials and disbursements and expenses necessary or desirable in continuing and conducting said business; to sell the product of defendant for

cash or on credit; to collect and receive the rents, income, accounts, and notes receivable and other properties and money to which the defendant may be entitled; to bring suit for collection, and receive and take into their possession all the property of defendant of every nature and description, to institute, prosecute, intervene, or continue in behalf of defendant any suits, actions, or proceedings at law or in equity concerning any of defendant's property or assets; to defend, make allowances upon, or otherwise adjust any claims of or against defendant; and to employ counsel and attorneys, their compensation to be subject to approval by this court; and to exercise in all things the usual powers of receivers; but all subject to the duty of said receivers to account for their acts and to be held responsible for failure to act properly as such."

November 20th the court authorized the receivers to borrow $50,-000, the loan to constitute a lien against the defendant's property prior to all other liens, and if an issuance of receivers' certificates was subsequently authorized, to be paid by such certificates or out of their proceeds.

December 4th the court, after notice to all parties, authorized the issuance of receivers' certificates to the amount of $300,000—

"the said certificates to be payable one year after date of issue, unless sooner paid, to bear interest at the rate of six per cent. (6%) per annum, payable semiannually, both principal and interest to be payable at the office of the Title Guarantee & Trust Company, in the city of New York, or such other place as the receivers may, in their discretion, determine, the said certificates to constitute a first and paramount lien upon all the property and assets of the company, real and personal, of every kind and description, now owned or hereafter acquired, and wheresoever situated, prior to the lien of any mortgage or lien now upon said property and assets or any thereof, saving and excepting, however, to the receivers the right to sell, use, and consume, in the ordinary course of the company's business as conducted by the receivers, any and all personal property and said certificates and coupons attached thereto to be substantially in the following form:"

The Title Guarantee & Trust Company, trustee under the first mortgage, did appear specially and object, but its objection was overruled, and it did not appeal.

September 27, 1918, the receiver petitioned for leave to discontinue the business, stating that:

"Through inability to obtain funds and from various other causes beyond my control, I am unable longer to continue said business. As a result of these causes I have been unable to conduct the business of the company at a profit, and do not believe that further operation under existing conditions would result in financial profit."

The next day the District Judge filed a memorandum containing the following:

"The receivers were authorized to continue the business in their discretion. The purpose of continuing the business was to produce a sufficient amount to recompense the creditors, if that were possible, but it was understood that the contract with the city of New York, by which this company was taking care of the garbage of the Greater City, must be carried out in order to save the city and the taxpayers from the effects of the wasteful and disagreeable methods which could otherwise be made use of. All the creditors and the entire body of taxpayers and citizens are concerned in this matter."

The receivers did discontinue the operation of the plant.
November 26 orders were entered permitting the Title Guarantee &

Trust Company and the Columbia Trust Company as trustees to foreclose their respective mortgages, which resulted in a fund of $202,000.

The first and vital decision of the special master, which was affirmed by the District Court, is that though the Metropolitan Company was a private and not a quasi public corporation, debts contracted by the receiver, whether upon general credit or upon an express agreement for lien prior to all other liens, were in either case entitled to such priority. This was upon the theory that the indebtedness incurred was for the preservation of the property, and that for such purpose priority could be given even in the case of a private corporation.

It may be that a charge for actual preservation from destruction, as for watchmen, would be so secured, because such services could not in the nature of things be had on credit; so also a charge for premiums of insurance, without the consent of prior lienholders, if insurance could not be obtained except upon such terms. But the indebtedness in this case was not incurred for the preservation of the property, but for the continued operation of the business because the receivers believed it was about to become profitable. Their petition of November 20, 1917, stated:

"Upon information and belief: That the funds with which to construct the Staten Island plant were obtained by the company through the issuance of secured indebtedness. This financing has proved inadequate, because of increased cost of construction of the plant and machinery, and the necessity of making a deposit of the sum of $200,000 to secure the performance by the company of the provisions of its lease of the Barren Island plant. The cost of maintaining and operating two plants, instead of one, has caused the company to operate at a loss. Conditions have been improving, and it is believed that the turn in the company's affairs should come about January 1, 1918, or shortly thereafter, after which it should operate at a profit. The heavy expense of operating the Barren Island plant will then cease; the initial period of operating the Staten Island plant necessitates readjustments, and experiments in co-ordination of machinery will have ended; and, in addition, the company will be able to sell its by-products, viz. grease and tankage (a base from which fertilizer is made), and after January 1, 1918, grease at a largely increased price. It is essential that the company continue to perform the contract with the city of New York. Said performance is a quasi public duty, as failure by the company would seriously imperil public health. The plant and assets of the company would be of little value for other purposes."

And the memorandum of the District Judge of September 28, 1918, supra, stated that they were authorized to continue the business in order to pay the creditors, that is, to make money, but primarily out of consideration for the public welfare, that is, treating the corporation as a quasi public corporation. See our opinion in Westinghouse Electric Co. v. Brooklyn Rapid Transit Co., 260 Fed. 550, 171 C. C. A. 334.

But the special master and the District Court went still further, holding that, even if the court had no power to give priority on the ground of preservation of property, the prior lien creditors were estopped from saying so, because, having notice, they had acquiesced in the orders, and did not appear and object and appeal. Only the Title Guarantee & Trust Company, trustee, actually objected, and it did not appeal.

[1] We are of opinion that the court was without power to give the receivers' general creditors priority over the Metropolitan Company's

prior lien creditors without their express consent. In re J. B. & J. M. Cornell (D. C.) 201 Fed. 387. Decisions in the case of public and quasi public corporations stand on entirely different grounds.

The orders being beyond the power of the court, the lien creditors cannot be deprived of their liens because they did not appear and object and appeal if their objection were overruled. They had a right then to rely upon the liens they had contracted for, and they have a right now to attack collaterally the orders made displacing them.

[2] It has been suggested that the equities are in favor of the receivers' creditors, but we do not think so. The prior lien creditors advanced their money to build the plant upon an express agreement for liens; if the business was to be continued, it should not have been at their risk, but at the risk of those who thought it wise to advance funds to continue it.

Two of the receivers' creditors are in a little different position, because one, the International Bank, did stipulate to receive certificates, which were never given, and the other, the city of New York, exchanged city stock deposited with it by the Metropolitan Company as collateral for receivers' certificates.

The International Bank loaned upon the promise of priority, and the city of New York was actually given, under an order of August 6th, amended August 15, 1918, receivers' certificates to the amount of $33,000 in exchange for city stock in the same amount that had been deposited with it by the Metropolitan Company under article E of its contract with the Metropolitan Company.

"(E) The contractor shall deposit with the comptroller of the city of New York, on or before the signing, sealing and delivery of this contract, the sum of fifty thousand dollars ($50,000) in lawful money of the United States of America, as additional security for the faithful performance of the terms and conditions of this contract, and as a fund to be drawn upon by the commissioner of street cleaning, to pay for any expense which may be incurred hereunder by said commissioner or by the city of New York, due to the failure of the contractor to comply with the said terms and conditions of this contract; the contractor shall have the option of depositing in lieu of the $50,000 in cash, corporate stock or certificates of indebtedness of any nature issued by the city of New York, which the comptroller shall approve as of equal value. If securities are deposited, instead of cash, the same shall be subject to all the conditions applying to the cash deposit herein set forth. The city shall, from time to time, collect all interest, dividends, or other profits or revenue on any securities deposited by the contractor, and shall, when collected, pay the same to the contractor; if the securities are in the form of coupon bonds, the coupons as they respectively become due, shall be delivered to the contractor.

If at any time it becomes necessary for the commissioner to make use of any of the moneys or securities so deposited, the contractor shall, upon notice from the commissioner, immediately restore the amount which has been withdrawn or expended by the commissioner."

"(P) If the contractor shall fail to perform any part of the work called for in this contract in accordance with the terms thereof and the commissioner decides not to cancel and terminate this contract as provided in clause O thereof, the commissioner shall have the power and is hereby authorized to perform or cause or procure to be performed such part of the work as the contractor shall fail to perform, at the expense of the contractor, and to deduct such expense from the special deposit provided for in clause E hereof. If such expense shall exceed the amount on deposit, the contractor shall pay the balance to the city."

In each case the orders were made without any notice to the lien creditors. The loan of the International Bank was made, not only without any express, but also without any implied, assent, because it was made, without notice, the day after the receivers were appointed.

And the city of New York did not cancel the contract under article O, and has proved no claim of the commissioner of street cleaning for any expense incurred by him due to the failure of the Metropolitan Company to comply with the contract for which the city stock was pledged as collateral.

The special and general creditors of the receivers and the general creditors of the Metropolitan Company may accordingly be laid out of the case because the funds to be distributed, viz. the surplus of the sanitary fund $128,000, and the foreclosure fund, $202,000 will be exhausted by prior lien creditors.

[3] It is said that the first mortgage is void because of the provisions in the contract between the Gaffney firm and the bankers. The control of the directorate of the Metropolitan Company was given to a voting trustee of the capital stock. It is true that this contract was mortgaged to the Title Guarantee & Trust Company, and that this provision was void as against public policy. But the provision was entirely severable, it had nothing whatever to do with the foreclosure of the mortgage, and should not affect its lien. The moneys secured by the mortgage were honestly loaned and honestly applied in building the plant, and to deprive bondholders of their lien for this reason would be inequitable in the highest degree.

The lien of the Title Guarantee & Trust Company, trustee under the first mortgage, upon the foreclosure fund of $202,000 is paramount, and the fund, less expenses, will go to it. The first mortgage was not a lien upon the surplus of the Sanitary fund and the noteholders were by agreement with the bondholders of the second and third mortagages given priority over them, so that the fund, less expenses, will go to them.

The court below is directed to enter a decree in accordance with this opinion, and to that end the decree is reversed.