**MID–CONTINENT SUPPLY CO. et al. v.
CONWAY et al.**

No. 6496.

Court of Civil Appeals of Texas.
Texarkana.

April 12, 1951.

Rehearing Denied May 24, 1951.

798

Lasseter, Spruiell, Lowry, Potter & Lasater, Ramey, Calhoun, Marsh, Brelsford & Sheehy, and Power, McDonald & Mell, all of Tyler, Clarence R. Fuller, Dallas, Cantey, Hanger, McKnight & Johnson, Fort Worth, for appellants.

Pollard, Lawrence & Reeves, William S. Reeves, L. L. James, and W. Edward Lee, all of Tyler, for appellees.

LINCOLN, Justice.

This is an appeal from a judgment of the District Court of Smith County in a

receivership proceeding of a business owned and operated by T. J. Conway as T. J. Conway Drilling Company. The record is voluminous, the parties are numerous, and the facts are complicated. We will state the case as briefly as possible as they relate to the issues.

The original petition filed July 2, 1948, alleged an indebtedness of Conway to various persons in excess of $200,000.00, and on the same date W. A. Pounds was appointed and qualified as Receiver.

At a meeting of creditors of Conway on July 29, 1948, following an adjourned hearing in bankruptcy proceedings then pending, the creditors present selected a Creditors' Committee composed of six men, each of whom was a secured creditor or represented a secured creditor of Conway. The Creditors' Committee adopted a "plan for the payment of Conway's debts, subject to the approval of his creditors listed in 'Exhibit A' attached hereto," bearing date August 4, 1948. Exhibit A attached thereto lists all creditors of Conway at that time, consisting of 11 secured and 92 unsecured creditors. The contract is a lengthy instrument which need not be copied in full, but the applicable terms of which will be stated as the issues are discussed.

All the creditors of Conway, both secured and unsecured, executed the agreement, the bankruptcy proceedings were dismissed, and soon thereafter the Receiver began operations of the business. On November 19, 1948, upon application, the court authorized him to borrow $25,000.00 and to issue a Receiver's Certificate therefor. The money was borrowed from the appellee Tyler State Bank & Trust Company, hereafter referred to as the Tyler Bank and a lien prior to all other liens except those already held by the Tyler Bank, was fixed against the drilling rigs and all other property of Conway to secure payment of this debt.

While engaged in performance of well drilling contracts the Receiver, from time to time, under authority conferred by the contract, borrowed additional sums of money from the Tyler Bank and pledged drilling contracts as security therefor. During such operations the Receiver also created debts in large sums from various firms on open account for supplies and equipment which were necessary to keep the rigs, trucks, tractors, and other property in suitable condition to carry on the business. The money borrowed from the Tyler Bank on security of drilling contracts, and the purchase of supplies on credit were done without order of the court.

The Receiver operated the business until about February 26, 1949, at which time it was found that the indebtedness of his operations was in excess of the income by more than $81,000.00. The Creditors' Committee was called together and decided to liquidate the business. Interventions were filed by various creditors and groups, seeking judgments for debts, foreclosures, and priorities of payment. The Receiver made his report and all the drilling rigs were sold for $100,000.00 cash under court order.

A trial was had before the court and the judgment decreed priority of payment in favor of secured creditors of Conway over the claims of the receivership creditors in disbursing funds already derived and to be derived from sales of the corpus of the estate, the only source of funds remaining at that time. The appellants are all supply creditors of the Receiver. Six of them, to-wit, Mid-Continent Supply Co., United Tool & Valve Co., Darby Equipment Co., S. Otto Craft, Jackson-Mayfield Supply Co. and Snowden Brothers were also original creditors of Conway. Appellant Craft was also a secured creditor and a member of the Creditors' Committee. The appellees are the Tyler Bank, Continental Supply Co. (Continental), Cardwell Manufacturing Co. (Cardwell), General Motors Acceptance Corporation (GMAC), American Supply Co. (American), and W. A. Pounds, Receiver. All of the appellees except Pounds, Receiver, were secured creditors of Conway. The correctness of the judgment as to amounts decreed to each secured and unsecured creditor, and supply creditors, is not challenged. All liens were foreclosed. The judgment is lengthy, and quite complicated, with liens overlapping here and there, prior in some respects and

subordinate in others. Without setting out its various provisions decreeing priorities, it is sufficient to say that the claims of appellants are the last to be paid, and this fact directs us to the first points of error to be considered.

■ Appellants urge that since appellees consented to the continuation of the receivership by their assent to the Creditors' Contract, the claims of the receivership or supply creditors are entitled to priority of payment out of the assets, the corpus, of the estate, except as to that portion of the judgment relating to the Tyler Bank's note secured by the Receiver's Certificate, and that the trial court erred in not so decreeing. This contention is grounded on the proposition that appellants, by their actions in signing the contract and participating in the receivership proceedings, have waived their respective priorities in favor of the supply creditors, or are estopped to claim priorities. Appellants rely upon the decisions of the Supreme Court in the cases of Craver v. Greer, 107 Tex. 356, 179 S.W. 862, 866, and Mayotown Lumber Co. v. Nacogdoches Grocery Co., Tex.Com.App., 236 S.W. 704. In the Craver case the Supreme Court said: "Where a lienholder procured the appointment of a receiver with the power to operate the property, which is subject to his lien, in a continuance of the business to which it is devoted, it is only just that the consequent expenses should take precedence over his lien, since it must be anticipated that such operation will be attended with cost, and possibly in excess of the income."

This general rule is supported by the Mayotown case and other authorities in Texas and elsewhere, and its correctness is not questioned by the appellees. But appellees assert it does not rule this case for two reasons; first, appellee lienholders had no part in securing appointment of a receiver, and the facts in evidence support that contention; second, under the terms of the contract their vested rights under their liens remained unimpaired. Except for reservations in the contract, the lienholders, by their action of consenting to and participating in the continuance of the

receivership and operations of the business after appointment, became parties to the receivership proceedings, 53 C.J., p. 254, and would be brought under the rule stated as above in the Craver case.

■ Whether the result last above indicated arises in this case depends upon the terms of the contract and the legal consequences flowing therefrom as they relate themselves to the legal principles above stated. The lien creditors could not be compelled to submit to the receivership at the hazard or expense of their vested rights. Craver v. Greer, supra, holding " * * * it is hardly necessary to restate the general rule that a receivership is always subject to vested rights. As broad as are the powers of a court of chancery, it is without authority to impair the force of contracts." Further quoting from the case, " * * * the authority, if it exists, for the displacement in such receiverships of a vested lien for indebtedness incurred through an operation of the business by the court must be found in an estoppel which is justly enforceable against the owner of the lien."

So, if lien creditors wished to enter this "plan for the payment of Conway's debts," they had the right to do so upon their own terms. There is evidence to support findings that, at all times from July 2nd to August 4th, 1948, the appellees each had ample security for their respective debts. They were unwilling to go into the plan without reservations deemed by them as sufficient safeguard to their vested liens. That the agreement was sufficient to maintain priority of appellees' liens over claims of the original unsecured creditors of Conway is clear, and is not challenged in this appeal. But was it sufficient to maintain such priority over claims of supply creditors?

The Receiver was directed to "conduct said drilling business and do and perform every act and thing necessary in the conducting of said business." He was authorized to make repairs and additions to equipment, to keep it in good state of repair and in its "present operating condition." There is evidence that the supplies could not reasonably have been furnished

and delivered to the rigs in the field except on credit. Appellants' accounts are for supplies necessary in the operation of the Receiver's business. These facts impel a sympathetic consideration of the claims of supply creditors; and standing alone they might be determinative of the issues here involved. But the receivership operations were carried on, because the contract so provided. It breathed life into the receivership which, without it, could and probably would have been swept aside. At all events, had the receivership proceeded without any agreement and without participation of secured creditors, the parties to this appeal, under the facts here presented, would stand in exactly the same position as they do now.

The liens of the Tyler Bank are clearly reserved throughout the contract. It is provided that "nothing in this agreement shall in any way prejudice the rights of the (Tyler Bank) with reference to its indebtedness against Conway or the T. J. Conway Drilling Company, or its liens securing same, and notwithstanding this agreement and arrangement, it (the bank) shall be free to deal with the said indebtedness and the collateral securing same in the same manner as if this contract did not exist." This is language too clear and unambiguous to require construction. Even the liens fixed in the Receiver's Certificate and the order granting it, although prior to every other existing lien, was subject to the liens then held by the Bank. So, also, the liens of GMAC, Cardwell, Continental, and American are each recognized, and no provisions are found subordinating them in any manner other than as consequent from the laws of registration. As illustrative, upon default in making payments to Continental and American, either of them might terminate the contract, proceed independently of it, and "in such event nothing in this agreement shall prejudice its rights with reference to the enforcement of its liens." After September 30, 1950, any creditor not paid in full was at liberty to collect the balance owing him by any method provided by law.

. These provisions, as well as the contract as a whole, manifest the intent of all signers that the receivership assets might be used in carrying on the Conway drilling business, but without prejudice to vested rights under the liens of the appellees. It is in this respect that the facts of this case are to be distinguished from those in the Craver case and the Mayotown case, supra. In each of those cases the lienholders, whose claims were subordinated to the claims of supply creditors, were privies to the appointment of the receiver, and had not by any means reserved the priority of their liens.

■ In 53 C.J., page 254, the following is stated as the rule applicable, we think, to the facts here: "The mere fact that the lienors have co-operated to the extent of trying to save something for the unsecured creditors while all the time asserting the superiority of their own claims does not amount to consent that their claims shall be subordinated to the expenses of operation for the benefit of the general creditors."

Also, the following: "The extent to which claims whose priority over liens is dependent on consent are entitled to preference is found, when consent is expressly given, in the language to or by which the lienor agrees to be postponed, which is to be construed according to its natural meaning where there is no ambiguity."

In American Engineering Co. v. Metropolitan By-Products Co., 2 Cir., 275 F. 34, 38, the Circuit Court of Appeals said: "We are of the opinion that the court was without power to give the receivers' general creditors priority over the Metropolitan Company's prior lien creditors without their express consent. * * * The orders being beyond the power of the court, the lien creditors cannot be deprived of their liens because they did not appear and object and appeal if their objection were overruled. They had a right then to rely upon the liens they had contracted for, and they have the right now to attack collaterally the orders made displacing them."

In Farmers & Merchants' National Bank v. Waco Electric Ry. & L. Co., Tex.Civ. App., 36 S.W. 131, 136, cited and quoted with approval by Chief Justice Fly in Houston Ice & Brewing Co. v. Clint, Tex.

Civ.App., 159 S.W. 409, 412, the Court said: "A court administering the rights of litigants in accord with the principles of law and equity has no inherent right, simply by virtue of its judicial authority, to displace valid mortgage liens that are fixed upon the property, and which is subject to the liens, and require that such liens shall be postponed to claims which were not in existence at the time the mortgage liens were created, or are not based upon some contract or provision of the law which gives them a prior right over the mortgage liens."

■ We are not here concerned with rules governing rights of creditors in receiverships of public service corporations. In those cases the matters now under review may stand on a different footing. But in case of private business concerns not impressed with a public duty, the displacement of prior liens by receivership claims must arise by consent or estoppel. 53 C.J., page 258, Sec. 430. It does not arise by virtue of any statute, Houston Ice & Brewing Co. v. Clint, Tex.Civ.App., 159 S.W. 409, 411, writ refused Tex.Sup., 169 S.W. 411, nor by operation of law. Missouri, K. & T. Ry. Co. v. McFaddin, 89 Tex. 138, 33 S.W. 853.

■ Under Par. V of the contract, the expenses of conducting the business by the Receiver were given priority of payment over lien creditors. But Par. V directs the Receiver to make such disbursements "from operating receipts." There is no similar provision anywhere in the contract relating to receipts derived or to be derived from sales of the corpus of the property. "A mortgagee who expressly limits his consent to the granting of a priority on the income to operating expenses is not taken thereby to have consented to a preference for such expenses in the corpus as against his mortgage." 53 C.J. p. 254.

■ Appellants urge that it is unjust and inequitable to hold that the contract executed by appellants provides for the receiver to operate the business and keep the property in repair, yet by virtue of the saving clauses in the contract no means are provided for paying for such expenses

if there is an operating loss, as has occurred. Apparently the parties to the contract had no expectations that losses would occur. It does not necessarily follow, however, that they did not contemplate the possibility. At least, it was incumbent upon them to do so. As said in the Craver case, supra, "it must be anticipated that such operation will be attended with cost, and possibly in excess of income." That possibility may very well account for the reason the contract carried numerous provisions safeguarding the rights of appellants in event their debts were not paid, meaning, of course, through operations. There were but two ways provided in the contract for the Receiver to obtain credit. He could borrow money and pledge the income from drilling contracts as security for its payment; and he could secure credit upon receiver's certificates not to exceed $25,000.00; or, by consent of the Creditors' Committee, he could obtain receiver's certificates for larger sums. The only application for authority from the court to secure credit, and the only order granted to do so, was in respect of Certificate No. 1, for $25,000.00. These limitations upon his authority negative any inference of consent to contracting debts in any other manner, or beyond the amount stated. Smith v. Shenandoah Valley National Bank, 4 Cir., 246 F. 379.

The order appointing Pounds as Receiver provided that he "is authorized and empowered to make contracts for the drilling of, and to drill, oil and gas wells, and to do and perform every act and thing necessary in the conduct of said business, including, but not limited to, the power to employ and discharge all necessary labor, clerical help, superintendents, tool pushers, attorneys, and any other persons required in the performance of such business; to borrow money to finance pay rolls and operations (and upon application to and further order by the court to secure said loans by Receiver's Certificates)."

■ The Receiver's authority to secure credit was thus limited in the order to one purpose, "to borrow money to finance pay rolls and operations," and loans for such purpose might be secured by receiv-

er's certificates after application to and order of the court. This limitation also, in our opinion, negatived any authority of the Receiver or his agents to go into the open market and contract debts for supplies needed in his operations. The Creditors' Contract enlarged upon those limitations, as follows: " * * * And it is further expressly agreed and understood that no creditor shall be bound by or liable for any act or agreement made by said Receiver or said Committee except as it is expressly provided herein. It is further expressly agreed and understood that no creditor executing this agreement shall be liable on any obligation incurred by the Receiver or the Committee nor for any negligence of the Receiver, any member of the Committee, or any employee or agent of the Receiver."

To grant priority of payment to supply creditors to be paid out of the corpus of the property would, in effect, fix a liability against secured creditors to the extent of their security for the acts, agreements and obligations of the Receiver, contrary to the foregoing provisions.

█ A Receiver represents the court and all parties in interest in the litigation. He is a trustee or ministerial officer of the court. Dallas Bank & Trust Co. v. Thompson, Tex.Civ.App., 87 S.W.2d 307. As such officer he "derives all of his authority from its decrees and orders * * *." Shell Petroleum Corp. v. Grays, Tex.Civ.App., 87 S.W.2d 289, 292, writ dismissed. The binding effect of his acts are to be tested by his authority, and not by his good faith. Hartford Accident & Indemnity Co. v. Farrell, Tex.Civ.App., 107 S.W.2d 442, writ dismissed. These rules are elemental in receiverships. Ama-Gray Oil Co. v. Marshall, Tex.Civ.App., 212 S.W.2d 960, 963.

█ The appellant supply creditors were charged with knowledge of the law that the authority of the receiver is limited to that given by the court. Baumgarten v. Frost, 143 Tex. 533, 186 S.W.2d 982, 159 A.L.R. 428. "Persons dealing with a receiver must at their peril take notice of his authority and the jurisdiction of the court." Continental & C. T. & S. Bank v. Muscatine B. & S. R. Co., 202 Iowa 579, 210 N.W. 787, 790, 50 A.L.R. 139; 23 R. C.L. 77. In International Shoe Co. v. U. S. Fidelity & Guaranty Co., 186 S.C. 271, 195 S.E. 546, 550, receivers were appointed to take possession of and operate several stores. In so doing the court had in view the payment of all the then creditors. The order authorized the receivers to use the proceeds of sales to replenish saleable stocks. The receivers bought from the claimants on credit, and the receivership failed to accomplish the purpose of its appointment. The Supreme Court said: "The sellers of the merchandise to the receivers, if they dealt with them as receivers, were bound to apprize themselves, at their peril, of the extent of the authority of the receivers."

Notwithstanding the order of the court directing the receiver to continue the business and replenish the stock, the court in that case remarks significantly that "nowhere is one particle of authority given them (the receivers) to buy *on credit* goods, wares and merchandise to replenish stock."

The impact of these authorities upon this case is obvious. It is a severe rule in any case that says to another, "You dealt with this man at your peril." But those who disregard the recorder's office and the records and files of the court in a matter of this kind must know the hazards of their nonaction in that respect. There is no evidence that any of the appellants took the pains of inspecting the records to ascertain the limits of the Receiver's authority before they extended credit. They never inquired of the Receiver by what authority was he operating or buying on credit. Six of the appellants knew of and had signed the contract. Letters to the Receiver's attorney from Mid-Continent and Oil Well Supply Co., the largest supply creditors, confined their inquiries to requests for financial statements and for information as to when they might receive payment for balances then due them by the Receiver. Craft also pressed for payment of his account for insurance. This is the extent of inquiries made by

any of the appellants, so far as the record shows. Had appellants made investigation they would have found that there was no authority for the Receiver to go out in the open market and buy supplies on credit and thereby secure payment by appropriation of property already under validly existing liens.

Our conclusion is that the appellees have not consented to a postponement of their liens against the corpus in favor of supply creditors of the Receiver other than as expressly stated in reference to the Receiver's Certificate, and that without such consent the court has no power to postpone. To permit the Receiver and his agents to go out and secure credit without limitation and then hold the debts so created by him are entitled to preference in payment out of the corpus, without the clear and unequivocal consent of the pre-existing lienholders, would deprive the court of its authority and subject vested rights to the will of the Receiver. It is hardly necessary to point out the tragic consequences of such rule. The right of contract has no sanctity without the correlative right of enforcement. What we have said disposes of appellants' first, second and third points, which are overruled.

By their fourth point appellants assert that the creditors' contract was against public policy insofar as it is construed to mean that the mortgage liens of the Tyler Bank, Continental, and American are to be preserved as against creditors of the Receiver whose debts were incurred under authority of the contract. This point is grounded on their contention that the "mortgage creditors should not be permitted to contract for the continuation of the business with the general public and receive the benefits thereof and at the same time withhold all the physical assets of the business from the payment of debts lawfully incurred in the prosecution of the business." We are unable to sustain this point. Generally speaking, a contract, not in itself immoral, nor in contravention of any law, is not contrary to public policy. Miller v. Roberts, 18 Tex. 16, 67 Am.Dec. 688; 10 Tex.Jur., page 190. There is perhaps, no higher public policy of the state

than to uphold contracts validly entered into and legally permissible in subject-matter. The Supreme Court in Missouri K. & T. Ry. Co. v. Carter, 95 Tex. 461, 68 S.W. 159, 164, adopted the following declaration as a correct statement: "* * * It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider: That you are not lightly to interfere with this freedom of contract."

By their fifth and sixth points of error, appellants assert that the Tyler Bank was estopped to urge priority of its debt over receivership creditors. Estoppel is grounded upon the assertion that Pounds, Receiver, as president of the Tyler Bank and its executive officer knew or should have known at the time the receivership debts were created that there was not sufficient income to pay them, that they could not be paid except out of the corpus of the property, and he failed to disclose such facts to receivership creditors before incurring such debts; that Pounds, as president and sole agent of the Bank, made the loans to himself as Receiver, taking as collateral the proceeds of drilling contracts; and that the Bank is chargeable with all such conduct on the part of Pounds. It is not claimed on this appeal that Pounds at any time did not act in good faith, that there was any fraud or over-reaching in any particular, or that he wilfully withheld any information. Nor does the evidence disclose any such facts. There was no evidence, factual or circumstantial, that the board of directors of the bank knew that Pounds was to be appointed Receiver or consented to it. The evidence shows that at the time most of the appellants' accounts were created Pounds did not know the business was going deep-

er into debt, and did not know of these debts of appellants. This was because the bookkeeper had not kept his posting current and could not furnish statements. He dismissed that bookkeeper and it required two or three months for another to bring postings up to date. It was then that the true conditions were discovered, and steps toward liquidation were taken. There is no evidence that the Tyler Bank had any knowledge whatever, acquired through Pounds or from any other source, that the receivership income would not be sufficient to pay all costs of operation. When the Tyler Bank made loans to the Receiver upon security of drilling contracts, it was doing so under the terms of the contract. The evidence does not support the conclusion that Pounds made the loans in behalf of the bank in his "sole representative" capacity as president. They were not made until submitted to and approved by the discount committee of the bank's board of directors. There is no evidence that the Tyler Bank exerted any influence over Pounds as Receiver.

"The doctrine of estoppel can only be invoked to postpone the rights of a lienor if the creditors change their position in reliance on the conduct of the lienor." 53 C.J., p. 255. And in Robertson v. Vernon, Tex.Civ.App., 3 S.W.2d 573, 575, affirmed Tex.Com.App., 12 S.W.2d 991, it is said: "In order for an estoppel to be available, a party must have, without any knowledge of the facts, changed his position to his injury by relying upon the truthfulness of what he believed to be the real facts, and he must have been misled by the action of the opposite party either by words spoken or by his having refused to speak when he should have done so."

There is no evidence whatever that the appellants were misled by anything that Pounds or the Tyler Bank did or said, nor that appellants extended credit to the Receiver in reliance on any statement or conduct of either of them. The Tyler Bank was under no duty to speak up to the appellants even had it known the true condition of operations. So far as the evidence goes, appellants knew the facts as soon as the bank and the Receiver learned

of them. Appellants were charged with knowledge to the same extent as the appellees. 45 Am.Jur. p. 147. In dealing with the Receiver they made themselves parties to the proceedings. Nothing that Pounds as Receiver or the bank did or failed to do was sufficient to induce and they are not shown to have induced appellants to extend credit when they would not have done so otherwise. 17 Tex.Jur. p. 142. For the reasons stated Points 5 and 6 are respectfully overruled.

What we have said in passing upon Points one to six, above, disposes of appellants' eleventh point and it is overruled.

Appellants by their seventh point urge error of the trial court in holding that mortgage creditors were entitled to priority of payment over receivership creditors to the extent of $52,417.90, which sum appellants claim was shown by the Receiver's final report (and approved by the court) to have been a diversion of receivership income contrary to the statute and to the creditors' contract. The Receiver's final report showed that he had paid out for "Fixed assets," $27,183.99; for "Payment on Mortgage debts of Conway," $23,519.44; and for "Payment on other Conway debts," $1,714.47. Special exceptions were filed to the report and overruled, and exceptions were taken to this action of the court. However, the point presented is not the correctness of the court's ruling on the special exceptions, as that is not raised by this point, but the action of the court in failing to hold, on final judgment, that the appellants were entitled to payment out of said sums before the listed items were paid. If the sums paid out on the foregoing items were diversions of the operating income from purposes required by the statute and by the creditors' contract, the judgment of the trial court could not be sustained in that respect. 53 C.J., p. 259.

█ Art. 2299, R.S. of Texas, gives a preference to certain classes of claims out of all monies coming into the hands of a receiver. This statute has been construed, however, to have reference alone to the earnings which come into the hands of the receiver, and gives no lien except as to the earnings of the property. Kamp-

mann v. Sullivan, 26 Tex.Civ.App. 308, 63 S.W. 173, writ refused; Gulf Pipe Line Co. v. Lasater, Tex.Civ.App., 193 S.W. 773, 779, writ refused; and certiorari denied Lasater v. Magnolia Pet. Co., 249 U. S. 599, 39 S.Ct. 257, 63 L.Ed. 796. "Other than as to the earnings during the receivership * * * our statutes contain no provisions regarding claims which are provable in receiverships". Pate v. Security Union Ins. Co., Tex.Civ.App., 54 S. W.2d 355, 357. Since there were no earnings, according to the uncontradicted testimony, the trial court was required to look to the contract and the evidence bearing upon these expenditures.

The receiver's report was subject to scrutiny during examination and cross-examinations of witnesses. Many of the facts set forth in the report were discussed. The trial court had before him not only the report but all of the notes and liens of creditors. Witnesses were examined with reference to what might be called permanent improvements or fixed assets. Some of that testimony was to the effect that the items listed as "fixed assets" by the accountant who prepared the report were expendables, some of it replacements, etc. Practically all of what was shown in the report as "fixed assets" was made the subject of inquiry. Conway testified that the value of the rigs was not enhanced by the expenditures we are discussing. In fact, his testimony was that the rigs would have sold for as much without the repairs as they did with them. The judgment involves a finding that the expenditures listed as "fixed assets" were not such in fact merely because they were so listed, that they were not permanent improvements to the rigs, not beneficial to appellees, and did not enhance the value of the rigs. These findings, as well as the further finding or conclusion, also involved in the judgment, that the payments aggregating $27,183.99 were not diversions of the funds, is supported by the evidence, and in this respect no error is shown.

Payments by the Receiver of $23,519.44 "on mortgage debts of Conway," were made by the Receiver in accordance with the contract. If they were prematurely made, it could have been of no concern to appellants, as they, with the exception of Craft, were not then creditors. There is no evidence that when they began to extend credit they relied on the terms of the contract in doing so. The evidence shows that at the time these payments were made, the Receiver was and had been making a profit and discounting his bills. The finding of the trial court that these payments to mortgage creditors were not diversion of funds of the Receivership is supported by the evidence, and no error has been shown.

With reference to the payment by the receiver of $1,714.47 "on other Conway debts," neither appellants nor appellees have given us any discussion of that item. We are not referred to any portion of the record except the Receiver's report where we might find any fact bearing upon this payment. We are not required to look through this voluminous record for evidence in support of or against allowance of the credit to the Receiver. The burden is on appellants to show the appellate court the record that supports their contention. Rule 418, T.R.C.P.; May v. Consolidated Underwriters, Tex.Civ.App., 170 S.W.2d 295. The trial court heard it all and had all exhibits before him, and in the absence of any showing of error, we must assume that the evidence supported the court's action in this respect. Appellants' seventh point of error is overruled.

In view of what we have said above, even if there was error of the trial court in overruling appellants' special exception No. 3, the error was harmless, and their twelfth point is overruled.

Appellants' eighth point complains of failure of the trial court to grant Otto Craft a judgment against W. A. Pounds, Continental and American for a balance due him on a secured note given him by Conway prior to receivership. The creditors' contract placed this debt seventh in order of preferences in payment out of operating receipts, and placed Continental as tenth and American as eleventh. The provision for payment of Craft was absolute and not limited to what might be received on sale of the mortgaged prop-

erty. The Receiver paid Continental $3,174.60 and American $1,000.00, out of operating receipts, but did not pay off Craft's note in full. Prior to receivership Conway had exchanged a 1945 Mack truck described in Craft's mortgage for a 1947 Mack truck, and had exchanged the Plymouth automobile described in the mortgage for a new Plymouth. The evidence does not show whether these exchanges were made with Craft's consent, but it was the intention of the parties involved to include or substitute the new motor vehicles in the mortgage for the ones described therein. The Receiver took possession of both new vehicles. The court recognized that Craft had an equitable lien on the 1947 Mack truck but not on the new Plymouth.

For like reason Craft had an equitable lien on the Plymouth. The Receiver acted contrary to the terms of the Creditors' Contract when he paid Continental and American without making full payment of Craft's secured debt. It is not sufficient answer that Craft was paid the proceeds from sale of the Chevrolet automobile, also described in the mortgage, and the 1947 Mack truck. As a secured creditor he was entitled to payment of his note in full, as provided in the contract. Money which should have been paid to him was paid either to Continental or American, or to both. Craft is entitled to a personal judgment for his balance of $471.63 and interest against W. A. Pounds and also against Continental or American, or both of them, according as the evidence may show which of them or whether both of them received the money to which Craft was entitled. Mayotown Lumber Co. v. Nacogdoches Grocery Co., Tex.Com.App., 236 S.W. 704. For the reasons stated this point of error is sustained and this part of the judgment will be reversed and remanded for further proceedings not inconsistent with this holding. In view of this action appellants' ninth point becomes immaterial, and it is overruled.

■■ By their tenth point appellants complain of action of the trial court in awarding priority of payment of fees allowed the Receiver and his attorney "as expenses of carrying on the receivership business," whereas "they were no more entitled to priority than the other creditors of the Receiver." The predicate for this point rests upon the fact that the contract places payment of expenses of conducting the business as fourth in priority and remuneration to the Receiver as fifth. These provisions, however, do not attempt to control disposition of funds to be derived from sales of the corpus. They relate wholly to "operating receipts." The judgment appealed from decreed that "After all of the said property is sold and converted into cash, the Receiver is hereby ordered and directed to immediately disburse all funds remaining in his hands as Receiver," in the order of priority, (1) court costs, (2) Receiver $6,500.00, (3) Receiver's attorney $2,750.00 in addition to all amounts theretofore paid the attorney. The point urged makes no attack on payments made to the attorney out of "operating receipts." The record discloses that the Receiver had not been paid anything for himself up to the date of the judgment, but that the attorney had been on a monthly retainer basis. There were no "operating receipts" at the time of judgment. All operations had ceased, and complete liquidation ordered.

The allowance of compensation to the Receiver for the services of himself and his attorney, or the amounts thereof, are not under attack—only the order of payment. Such allowances are usually considered as part of the court costs. Shell Petroleum Corp. v. Grays, supra. We think they were entitled to the priority in payment decreed by the court, particularly in absence of objections by appellees, and this point is overruled. St. Louis Union Trust Co. v. Texas Southern Ry. Co., 59 Tex.Civ.App. 157, 126 S.W. 296, writ refused; Payne v. Little Motor Kar Co., Tex.Civ.App., 266 S.W. 597, writ dismissed; Bryan v. Early, Tex.Civ.App., 266 S.W. 792, 45 Am.Jur. p. 218, Sec. 281.

Under the thirteenth point of error, it is shown that appellants excepted to the Receiver's report wherein the Receiver is credited with $26,600.22 as "general expense." It is asserted that the report fails

to show the purpose or necessity of such expenditures, and does not itemize them "in such a way that it can be determined whether they were authorized by the court." The special exception was overruled, and the report was approved.

The only portion of the record to which we are referred in connection with this point is the transcript where the special exception is stated. Exhibit A attached to the report contains forty pages, each being double legal size. It is referred to in the report as "a schedule of receipts and disbursements covering his operations." On each of two sheets of Exhibit A there is a summarized statement of cash receipts and disbursements and under the latter heading is shown "General Expense $27,-608.03." Thus it appears that there is a difference of $1,007.81 in general expense stated in the special exception and in the Receiver's account. It must be assumed that that difference was correctly spent. But we are unable to allocate that sum to any particular item or items in the report. The identical sum named in the special exception is nowhere pointed out, and if found it would require a minute examination of Exhibit A, with no assurance then that it could be located. This being the state of the record, no error has been shown and we must overrule this point.

By their fourteenth point appellants assert error of the trial court in overruling their special exception No. 9 directed at the Receiver's report. The special exception points out that said report shows payments to Edward Lee of various sums aggregating $5,544.55, from July 30, 1948, to April 5, 1949, giving the date, check number, and amount of the check. The Receiver is the only appellee who replies to this and to the fifteenth point. No explanation is given in the report, nor is there any evidence in the statement of facts, to show for what purpose or by what authority said payments were made. The record shows that Lee was attorney for the Receiver, that he was paid a retainer, that he spent much time and travelled extensively during operations, and that he also was assignee of claims against the estate. Nei-

ther the report nor the account attached to and made a part of the report show whether such payments were for necessary or emergency supplies furnished by him, or for reimbursement for supplies or travel expense paid by him, or upon his retainer, or for other reasons. All the account shows is that the various payments, ranging from $97.99 to $1,543.67 were charged to "General Expense."

"A receiver's report or account should be of such particularity as will give the parties interested sufficient information to enable them to determine intelligently whether to assent or except to the report or part thereof." Texas Steel Co. v. Huey & Philp Hdw. Co., Tex. Civ.App., 79 S.W.2d 636, 639, writ dismissed; 53 C.J. 368, Sec. 598. See also Shell Petroleum Corp. v. Grays, supra; 53 C.J. 366, Sec. 593; 36 Tex.Jur. p. 268.

"It is the duty of a receiver, in the administration of his trust, to keep regular itemized accounts of all receipts of money and property and of his expenses and expenditures, and such accounts and all his vouchers should be kept in such condition that they will be ready for examination at any time." 53 C.J. 172, Sec. 222.

The account of a receiver is his own ex parte statement, and is without binding force unless confirmed. The exception to the account raised a fact issue and the burden of proof to show he is entitled to credits which he claims is upon the receiver. 53 C.J. 372, Sec. 604. Before the report was filed, which included the accounting, Mr. Lee, as attorney for the Receiver, tendered all bank statements, bank deposits, and checks for inspection of any counsel desiring to inspect them, and also tendered his assistance in picking out any one item for inspection. Counsel for appellants then stated that they would like the opportunity to study them if they could be left available and to this suggestion Mr. Lee replied, "I can only leave them available with our bookkeeper." Whether there was a tender of the books, records, checks, etc., of the Receiver in connection with the final account or after it was filed is not shown, nor does it appear whether

such records were then available to appellants or to the court. It was said in Texas Steel Co. v. Huey & Philp Hdw. Co., supra, that "It is true that the receiver on the trial brought into court his books and records and tendered them to appellants for inspection, and offered to explain to appellants any portion of them", but the Court of Civil Appeals held the report of the receiver insufficient in language already quoted above.

In Hardt v. Levy, 20 App.Div. 400, 46 N.Y.S. 815, 817, affirmed by memorandum decision in 155 N.Y. 660, 49 N.E. 1097, exceptions were filed to the receiver's report showing such disbursements as "trial fee, affidavits, etc., $52.39"; "carriage hire, telegrams, etc., $14.75"; "service of orders, etc., $31.35"; "copying records, $45.00"; "lithographing requests to find, $24.00"; "serving subpoenas, $408." That report stood on a higher footing than in the instant case, because the items challenged had been passed by a master. But the court said, "There is no proper proof to support them, and, as they were duly objected to, they cannot be allowed. *The production of vouchers for them does not prove the necessity of the expenditures, but only the fact of payment.*" (Emphasis added.)

 Appellants were entitled to know what the various sums of money were spent for. To report them under a heading of general expense, or miscellaneous expenditures—and they mean about the same thing—does not afford interested parties the information and particularity to which they and the court are entitled. It may be assumed that the report was an exact reproduction of the account books of the items under consideration, and that the Receiver and his attorney could produce every voucher to support the report. But, as said in the New York case, these would not prove the necessity nor the propriety of the expenditures, but only the fact of payment. Appellants were not challenging the fact of payment, nor that such entries were in the books. There is not the slightest suggestion of irregularities or improper expenditures. What they were asking was, what was the money spent for, and why. We assume

that the Receiver and Mr. Lee, who is an experienced and reputable attorney, acted in the utmost good faith in making and receiving the payments. But the best of attorneys, as well as the courts, frequently differ on the legality of expenditures made by a receiver. That the issue may be correctly passed on, it is necessary that sufficient explanations for the credits be made by the receiver. We think the trial court erred in overruling this special exception, and the point of error is sustained. This action will require that the judgment in this respect be reversed and this part of the cause remanded for further proceedings in consonance with the views herein expressed.

Appellants' fifteenth point is levelled against the action of the trial court in overruling their special exception No. 11, to the Receiver's report, wherein it shows certain payments there set out were made in satisfaction of notes given prior to the receivership, the ground of exception being that "such payments were unauthorized by order of the court." The creditors' contract provided that Conway should pay his unsecured creditors one-third of their accounts on or before October 1, 1951; that he should execute and deliver to L. L. James a note for the balance to each such creditor; and that various secured creditors should be paid out of operating receipts. The report shows payments to secured creditors and upon notes given before the receivership. It was not necessary that the payments be authorized by the court before they were paid. When considered in connection with the fact that the contract so provided, "the general rule against * * * expenditures without the previous authority of the court should not be rigidly or sternly enforced * * * where the receiver has acted in good faith and under such circumstances as will enable the court to see that if previous authority had been applied for it would have been granted." 53 C.J. page 158, Sec. 199. It is not claimed that the Receiver did not act in good faith in making the payments set out, nor that the sums of money were not paid in keeping with the contract, nor that they were for such purposes as the court would not have granted authority for

their payment. The only ground of error asserted is that "such payments were unauthorized by order of the court." Since payment of notes given prior to receivership was authorized by the contract, and the court recognized the rights as fixed by the contract, it was not necessary for the payments to specifically and expressly be authorized before they were made. This point of error is overruled.

The judgment of the district court is reversed and cause remanded in part, with instructions that judgment be there rendered in favor of Otto Craft for $471.63 and interest against W. A. Pounds personally, and against Continental Supply Company or American Supply Company, or both, as their liabilities may appear upon further hearing of this particular claim; that the court sustain appellants' special exception No. 9 directed at the report and account of the Receiver, and require an amendment of that portion of the Receiver's report and account pointed out in said special exception, and that after hearing thereon the court pass upon the various items of expenditures to determine their allowance or rejection.

In all other respects the judgment of the district court is affirmed and that it be amended in keeping with the trial court's findings, conclusions and decrees in the matters referred to above.

The costs of this appeal are awarded one-half against the appellants and one-eighth each against W. A. Pounds individually, W. A. Pounds, Receiver, American Supply Company, and Continental Supply Company.

Affirmed in part and reversed and remanded in part.

### On Rehearing

In the foregoing opinion it was stated that under the judgment appealed from, "the claims of appellants are the last to be paid". The statement is not in exact keeping with the terms of the judgment, under the provisions of which the appellants were to be paid after the Tyler Bank and Continental, both secured creditors prior to the receivership, had been paid in full. The factual error, however, is not material to the decision and is corrected only in the interest of accuracy.

We have concluded that we were in error in overruling appellants' fifteenth point. The report to which exception No. 11 was directed shows payments by the Receiver aggregating $5,663.13, made between August 26, 1948 to and including February 15, 1949, the various sums making up the aggregate having been paid to Ed Lee, Tyler State Bank & Trust Company and Kirby Petroleum Company. The report shows that such payments were made in satisfaction of notes given prior to the receivership, and was challenged "because such payments were unauthorized by order of the court." The Receiver's report does not give further pertinent facts, such as, for instance, the dates of the respective notes, the amounts thereof, the interest rates, if any, by whom the notes were originally given, whether the payments set forth were in full or partial payments, the consideration for such notes, why the Receiver considered them entitled to priority in payment, whether such payments were made out of operating receipts or from funds derived from sales of the corpus, what if any security was pledged, by what authority, if any, such payments were made, nor why made without court authority if this was so done. In fact, full and complete disclosure of all pertinent facts and circumstances relating to the notes and their payment was called for.

In passing upon the fifteenth point of error in the original opinion we made the statement that payment of notes given prior to receivership was authorized by the contract. Our attention has now been directed to the fact that the contract specifically named the secured creditors and, in some instances, the amounts of their indebtedness, payment of which was accorded priorities. The items challenged by special exception No. 11 do not appear to have come within that category. Two of the payments challenged were made to the Tyler Bank, which was one of the secured and preferred creditors. Whether the payments made to the bank come within such preference we are unable to say, since no facts

are stated upon which an opinion may be expressed.

It now appears that the fifteenth point is brought within the same rule as the fourteenth point which was fully discussed in the foregoing opinion. For the reasons set forth in our discussion of appellants' fourteenth point we feel that the fifteenth point of error should also be sustained. On remand the trial court should sustain appellants' exceptions No. 9 and No. 11 as set forth in this appeal, and require the Receiver to amend those sections of his report by giving full and complete information on the matters involved. After hearing the facts the trial court will then be in position to pass on these sections of said report. We are not to be understood as holding here that orders of the court were or were not necessary prior to making the payments under consideration. See citation to 53 C.J., p. 158, Sec. 199, in original opinion.

Appellants' motion for rehearing is granted in part, our judgment and decision overruling appellants' fifteenth point is set aside, and said point is now sustained, and the cause is further remanded to the district court for proceedings in accordance with this opinion on the trial court's action under appellants' special exception No. 11 to the Receiver's report, in addition to our original holding relative to special exception No. 9. In all other respects appellants' motion for rehearing is overruled.